IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

|  |  |
|---|---|
| PULSELINK SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ZOOM COMMUNICATIONS, INC.,<br><br>Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which plaintiff the PulseLink Systems, LLC ("PulseLink" or "Plaintiff") makes the following allegations against defendant Zoom Communications, Inc. ("Zoom" or "Defendant"):

## NATURE OF THE ACTION

1.      This is a civil action for infringement of U.S. Patent No. 7,925,717 (the "'717 patent), U.S. Patent No. 9,900,553 (the "'553 patent"), and U.S. Patent No. 10,080,231 (the "'231 patent") (collectively, the "Asserted Patents") arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

## THE PARTIES

2.      PulseLink is a Texas limited liability company with a principal place of business in Allen, Texas.

3.      Defendant Zoom Communications, Inc., is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in San Jose, California. Zoom is registered to conduct business in the State of Texas Zoom and may be served via its registered agent located in this District at Incorporating Services, LTD., located at 3610-2 North

1

Josey, Suite 223, Carrollton, Texas 75007.[1] Zoom Communications, Inc., was formerly known as Zoom Video Communications, Inc.

4.      Zoom is a multinational information technology company that develops and provides cloud-based communication and collaboration products and services, including the Zoom videoconferencing platform/phone, messaging and video systems. Zoom sells and provides its products and services to customers and users around the world, including to customers and users in this District.

5.      Zoom operates and owns the "zoom.us," "zoom.com," "support.zoom.com," and related websites through which it markets, offers, distributes, and provides technical support for its cloud-based communication and collaboration products and services, including the Zoom videoconferencing platform/phone, messaging and video systems throughout the United States including in this District.

6.      Zoom places, has placed, and/or contributed to placing the products and services accused of infringement in this Complaint into the stream of commerce via an established distribution channel knowing or understanding that such products and services would be sold and/or used in the United States, including in this District. Zoom has also derived substantial revenues from infringing acts in this District, including from the sale of such products and services and inducing the use of such products and services by users in this District.

7.      Zoom is engaged in making, using, selling, offering for sale, and/or importing, and/or inducing its subsidiaries, affiliates, partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, the products and services accused of infringement.

8.      Prior to the filing of the Complaint, PulseLink attempted to engage Zoom in good

---

[1] https://comptroller.texas.gov/taxes/franchise/account-status/search/32059893183.

faith licensing discussions related to the Asserted Patents, including by sending correspondence on March 26, 2026, seeking to engage in licensing discussions and notifying Defendant of the Asserted Patents. Zoom's past and continuing sales of the Accused Product (i) willfully infringe the Asserted Patents and (ii) impermissibly take the significant benefits of the patented technologies without fair compensation to PulseLink.

9.      Through offers to sell, sales, imports, distributions, and other related agreements relating to the products and services accused of infringement in this Complaint, Zoom does business in the United States, the State of Texas, and this District.

## JURISDICTION AND VENUE

10.      This action arises under the patent laws of the United States, Title 35 of the United States Code, including in particular 35 U.S.C. §§ 271, 281, and 284-285, among others.

11.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

12.      This Court has personal jurisdiction over Zoom in this action pursuant to due process and/or the Texas Long Arm Statute. Zoom has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Zoom would not offend traditional notions of fair play and substantial justice.

13.      Zoom has purposely availed itself of the laws and protections of the United States and the State of Texas by knowingly making, using, selling, offering for sale, distributing, marketing and/or advertising the Accused Product in Texas and this District. Zoom maintains continuous and systematic contacts within this District by selling and offering for sale products and services to customers in this District and by offering for sale products and services that are used in this District. Zoom, directly or through subsidiaries or intermediaries, has regularly and systematically conducted and conducts substantial business in this District, including but not

3

limited to: (i) making, using, offering for sale and/or selling infringing products or services in this District; (ii) engaging in at least part of the infringing acts alleged herein; (iii) purposefully and voluntarily placing one or more infringing products or services into the stream of commerce with the expectation that those products or services will be purchased and/or used by consumers in this District; and/or (iv) regularly doing or soliciting business, engaging in other persistent courses of conduct or deriving substantial revenue from products and services provided to individuals in Texas and in this District. Zoom has targeted the State of Texas and this District by conducting regular business therein, and has placed and continues to place infringing products into the stream of commerce through an established distribution channel with the expectation and/or knowledge that they will be purchased by consumers in the State of Texas and this District.

14.     These products and services include the products and services comprising the accused Zoom's video conferencing platform (the "Accused Product" defined further below), that Zoom licenses, markets, and operates.

15.     Separately, Zoom has purposefully availed itself of the benefits of conducting business in Texas by seeking and obtaining TX-RAMP Certification from the Texas Risk and Authorization Management Program. This certification, which specifically covers the Accused Product, demonstrates Zoom's intentional efforts to solicit and maintain long-term commercial relationships with Texas state agencies and institutions, including those located within this District.[2]

16.     PulseLink's claims for patent infringement arise directly from and/or relate to the above-referenced activity.

17.     Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) because Zoom has a regular and established places of business, regularly transacts business, and has committed and

---

[2] https://www.zoom.com/en/trust/legal-compliance/tx-ramp/.

continues to commit acts of patent infringement in this District, including as set forth above and below.

18.    Venue is proper because, on information and belief, Zoom has a regular and established place of business in this District, including making use of offices in this District in at least Plano, Texas. Zoom is registered with the Secretary of State to do business in Texas. Zoom also has, on information and belief, authorized sales, customer success, account executives and customer service representatives that offer for sale and sell infringing products to consumers throughout Texas and in this District on a regular and sustained basis. On information and belief, Zoom currently operates out of or makes use of leased, work-share, co-op or other arrangements for space, offices or facilities in this District, including through its partners and/or agents.

19.    For example, on information and belief, Zoom implements a comprehensive work-from-home policy under which Zoom has adopted or ratified one or more additional places of business in this District, including but not limited to the homes of employees, such that the collection of these locations constitutes an aggregate network of regular and established places in this District, in and from which business is operated. Such employees include, on information and belief, over 180 remote employees in Texas according to a LinkedIn search. For example, Zoom employs persons in Texas and this District, including a (i) Senior Business Operations Manager, (ii) Upmarket Account Executive responsible for leading the Enterprise territory of 1000+ employees across Texas, Oklahoma, Louisiana, and Arkansas, (iii) Chief Marketing & Communications Officer, (iv) finance personnel, (v) legal counsel including its Senior Commercial Counsel and Chief Compliance & Ethics Officer, (vi) Regional Partner Manager, (vii) Vice President and Head of Brand & Media responsible for leading Zoom's overall marketing strategy, paid media & advertising, brand partnerships/sponsorships, owned and earned social media, and tentpole events, and (viii) Regional Channel Manager, (ix) Account Executive, (x) Customer

5

Success Manager, (xi) Head of Enterprise Growth & Sales Strategy, (xii) Business Development Representative, (xiii) Leader Channel Sales – Central Region (which includes Texas) and is located in Plano, Texas, (xiv) Enterprise Account Executive, (xv) Senior Software Engineer, (xvi) Enterprise Solutions Engineer/Solutions Architect, (xvii) Head of Americas Marketing in Frisco, Texas. Further, on information and belief, Zoom employs account executives, solutions engineers, and customer success managers who reside within this District and who regularly conduct Zoom's enterprise sales and customer service business within the District on an ongoing, sustained basis. The work of such Zoom personnel is therefore inextricably connected to this District.

20.    Additionally, Zoom specifically advertises for and solicits sales and service employees to reside and work remotely in this District and the State of Texas, including to support its customers in the District, and provides and/or stores literature, equipment and/or inventory at those locations for the purpose of enabling these employees to conduct their jobs and use such literature, equipment and/or inventory specifically in this District.

21.    Further, Zoom "operate[s] in leased office spaces and data centers"[3] and operates in centers from cloud hosting providers "for hosting of certain critical aspects of [its] business"[4] located, on information and belief, in this District and the State of Texas.

22.    For example, Zoom selected Oracle as its scalable cloud infrastructure provider for its core video conferencing and related services.[5] Specifically, Zoom hosts its core video processing—comprising its MultiMedia Routers ("MMRs"), via the Oracle Cloud Infrastructure. Through these cloud servers, Zoom processes and transfers in excess of seven petabytes of data

---

[3] https://www.sec.gov/Archives/edgar/data/1585521/000158552125000202/zm-20251031.htm (Zoom 10-Q for quarterly period ending October 31, 2025 at 74).
[4] https://www.sec.gov/Archives/edgar/data/1585521/000158552124000030/zm-20240131.htm (Zoom 10-K for FY ending January 31, 2024 at 15).
[5] https://www.oracle.com/customers/zoom/.

each day.[6] Through Zoom's core partnership with Oracle, on information and belief, Zoom utilizes and is co-located at Oracle data center in C1 Dallas-Allen (LOT 1) in Allen, Texas, located within this District.[7]

23.    Furthermore, Zoom utilizes Microsoft Azure's Content Delivery Network ("CDN") to facilitate its customer-specified managed services.[8] Microsoft's website confirms that its Azure content Delivery Network has a "point of present (POP) location[]" in Plano, Texas.[9] Zoom leverages Azure's infrastructure specifically to optimize interoperability, enterprise telephony, and virtual desktop performance. By way of example, when a user physically located in Marshall, Texas, initiates a Zoom call through the Microsoft Teams interface, the request is broadcast via Anycast. Microsoft's Azure Front Door identifies the Plano Edge PoP, located within this District, as the optimal entry point. The signal is then routed through this District via Microsoft's private backbone to the Zoom API (hosted in Zoom's Dallas data center or via AWS) for identity and permission authentication. Once the call is established, the video and audio packets (UDP) bypass the Teams core entirely, utilizing the local infrastructure within this District to maintain the communication session. Following the initial authentication, media packets are routed directly to the nearest Zoom MultiMedia Router ("MMR"). For a user situated in Marshall, Texas, this traffic is typically processed through infrastructure hosted at regional co-location facilities, such as the CyrusOne or Digital Realty sites. Furthermore, on information and belief, through its strategic partnership with Microsoft, Zoom utilizes and is co-located at Microsoft's Point of Presence ("PoP") facility in Plano, Texas. Because this PoP facility is located within this Judicial District, Zoom conducts a substantial portion of its service delivery and infrastructure operations locally to

---

[6] https://www.oracle.com/customers/zoom/.

[7] https://comptroller.texas.gov/taxes/data-centers/data-center-lists.php.

[8] https://www.sec.gov/Archives/edgar/data/1585521/000158552124000030/zm-20240131.htm (Zoom 10-K for FY ending January 31, 2024 at 15).

[9] https://learn.microsoft.com/en-us/azure/frontdoor/edge-locations-by-region.

support users in Marshall and the surrounding areas.[10]

24.    Furthermore, Zoom and Microsoft engage in Direct Peering, establishing a dedicated, high-capacity interconnect between their respective networks to optimize data exchange.[11] While Dallas serves as a primary regional exchange hub, overflow and Edge traffic, specifically for Teams-integrated features, is distributed across a broader infrastructure of Points of Presence ("PoPs"). By utilizing Microsoft's Anycast routing protocol, Zoom ensures that traffic originating from users in Marshall, Texas, is dynamically directed to the most efficient gateway. During periods of peak network congestion—which occur predictably during business hours—this protocol automatically redirects Marshall-based traffic to the Plano PoP situated within this District. Consequently, Zoom's core service functionality is regularly and systematically facilitated through physical hardware located in the Eastern District of Texas.

25.    Zoom's partner, TekVizion PVS, Inc. ("TekVizion,") located in Plano, Texas has its headquarters and a state-of-the-art testing facility within the District. Zoom, through its partner TekVizion, tests the Accused Product in this District.[12] TekVizion publicly touts that Zoom uses its testing facility, that TekVizion is an extension of Zoom's in-house certification team, and that TekVizion manages the Zoom Hardware Partner Certification Program.[13] TekVizion provides Zoom's Hardware Partner Certification Program, validates the interoperability of Zoom rooms, and other Zoom partner ecosystem products, including testing and certification relating to the use of Zoom Meetings. Upon information and belief, TekVizion acts as an agent of Zoom, and Zoom carries out its business operations, including the use of physical infrastructure, at TekVizion's facility located in Plano, Texas.

---

[10] https://learn.microsoft.com/vi-vn/azure/frontdoor/edge-locations-by-region.
[11] https://learn.microsoft.com/en-us/azure/internet-peering/peering-service-partner-overview#
[12] *See, e.g.*, https://www.tekvizion.com/inside-our-lab/.
[13] *See, e.g.*, https://www.tekvizion.com/partners/; https://www.tekvizion.com/zoom-selects-tekvizion-labs-to-accelerate-certification-testing-of-zoom-partner-ecosystem/.

26.     On information and belief, Black Box Limited ("Black Box") provides and supports Zoom's Workplace solutions, including the Accused Product, to end-users within the United States and this District. Black Box's U.S. headquarters are located at 2701 North Dallas Parkway, Suite # 510, Plano, Texas 75093. Black Box is a global systems integrator that specializes in reselling and supporting the Zoom Workplace ecosystem. Zoom identifies Black Box as Platinum Partner, Reseller Partner, Agency Partner, and Strategic Advisor, designing, implementing, and managing Zoom Rooms, Zoom Phone, and Zoom Customer Experience (CX). They provide comprehensive integration services, including hardware deployment (AV), networking, and support for modern, hybrid workplaces globally and in this District.[14]

27.     More specifically, Zoom identifies Black Box as a Reseller Partner that "works with Customers to provide end-to-end business solutions inclusive of the Zoom collab and experience platform, to deliver successful business outcomes."[15] Zoom touts that Black Box has "has significant Zoom sales experience, up-to-date Zoom training and product knowledge, and are highly engaged with Zoom to deliver effective solutions."[16] Zoom identifies Black Box as an Agency Partner that introduces "Zoom solutions to Customers" and works "jointly with Zoom throughout the sales process" with "pricing, contract, implementation and invoicing [] all performed by Zoom."[17]

28.     Zoom further identifies Black Box as a Strategic Advisor having "demonstrated proficiency with Zoom solutions" and "a history working with Zoom to deliver those solutions to customers of all sizes."[18] On information and belief, Zoom trains, certifies and provides

---

[14] https://www.ascdi.com/black-box-expands-platinum-level-zoom-certifications-with-the-addition-of-zoom-cx/#.

[15] https://partner.zoom.com/partner-locator/ (search BlackBox US).

[16] *Id*.

[17] *Id*.

[18] *Id*.

accreditations to Black Box employees in this District and elsewhere on Zoom's Workplace solutions, including the Accused Product. Black Box identifies itself as a "Zoom Platinum Partner and Certified Integrator" with "expertise in selling and scaling Zoom solutions," "elite capability in deploying and supporting Zoom at scale," and as an organization that provides Zoom "certified design, deployment and lifecycle management" of Zoom solutions, including the Accused Product.[19] Such training, certification and accreditation covers sales competencies, deployment service, and support service.[20] On information and belief, Black Box performs value added services inextricably tied to products and services Zoom provides to its customers. Zoom has a regular and established place of business in this District through the physical office and technical staging facilities of its agent, Black Box, which acts as Zoom's certified representative for the deployment and maintenance of Zoom Meetings throughout the Eastern District of Texas. On information and belief, venue is proper in this District under 28 U.S.C. § 1400(b) because Zoom conducts a substantial portion of its business through its authorized agent, Black Box Corporation, which maintains its global headquarters in Plano, Texas, and performs essential, certified technical installations and managed services for the Accused Product at Zoom's direction and control within this District.

29.    Zoom's systematic use of authorized agents to conduct its business operations and provide technical services within this District constitutes a regular and established place of business for Zoom, rendering venue proper under 28 U.S.C. § 1400(b).

30.    On information and belief, Zoom also maintains a fixed and physical presence within this District through its proprietary Zoom Node appliances, including Zoom Meetings Hybrid modules, which are deployed at enterprise campuses and facilities throughout the District.

---

[19] mw-redefining-workspaces-zoom-black_box.pdf.
[20] Id.

These appliances are not merely passive hardware; they constitute regular and established places of business of the Defendant. Zoom exercises exclusive and continuous 24/7 operational control over these proprietary nodes, managing all software deployments, security protocols, and performance parameters. By physically occupying space within the District with its proprietary infrastructure, Zoom utilizes these locations to deliver the Accused Product directly to its high-volume enterprise customers, thereby conducting its business through a permanent physical presence situated within this District.

31.    Zoom's regular and established business presence in this District is further ratified by its Texas Risk and Authorization Management Program ("TX-RAMP") Certification. [1] To maintain this certification, Zoom voluntarily submits to continuous monitoring and standardized, recurring security assessments by the State of Texas. This certification serves as a formal guarantee that Zoom's cloud infrastructure and proprietary nodes remain permanently available and operationally secure for state-affiliated enterprise customers, including government agencies and public universities situated within this District. By maintaining TX-RAMP status, Zoom has committed to a regulated, long-term operational presence within the State and this District, ensuring its services are integrated into the District's essential public and private infrastructure.[21]

32.    Zoom further leverages the Texas Department of Information Resources ("DIR") Cooperative Contracts program to facilitate the sale and distribution of the Accused Product to public entities throughout this District. Under these DIR contracts, Zoom is an authorized vendor, enabling state and local government agencies, public educational institutions, and other state-affiliated entities situated within this District to procure the Accused Product directly through standardized cooperative agreements.[22] On information and belief, numerous public entities within

---

[21] https://www.zoom.com/en/trust/legal-compliance/tx-ramp/.
[22] https://dir.texas.gov/contracts/dir-cpo-5185.

this District—including local municipalities and educational bodies—regularly utilize these DIR contracts to purchase and deploy the Accused Product. Consequently, Zoom's participation in the DIR program constitutes a purposeful and systematic effort to conduct business and facilitate infringing use of the Accused Product by customers physically located within this District.

33.     Zoom has committed and continues to commit acts of patent infringement within this Judicial District by maintaining, operating, and utilizing physical infrastructure, including proprietary Zoom Node appliances and integrated Content Delivery Network ("CDN") Points of Presence ("PoPs"), that employ the infringing methods and systems of the Asserted Patents. Zoom utilizes this local infrastructure to host, process, and distribute the Accused Product directly to its customers situated within the Eastern District of Texas. By executing these infringing processes through hardware located in this District, including the Plano PoP and on-site appliances at enterprise campuses, Zoom conducts a systematic and regular portion of its infringing activity through a fixed and physical presence within this District.

34.     Zoom commits acts of infringement in this District by operating its adaptive media infrastructure to route and process real-time video communications through the Accused Product. For every video session delivered to a customer in this District, Zoom, either directly or through its local infrastructure, performs each step, or at least a significant and essential step, of the asserted method claims within the geographical boundaries of this District.

## THE ASSERTED PATENTS

### U.S. Patent No. 7,925,717

35.     The '717 patent, entitled "Secure interaction between a mobile client device and an enterprise application in a communication system," lawfully issued on April 12, 2011. A true and correct copy of the '717 patent is attached as Exhibit 1.

36.     The '717 patent names Wu Chou, Juan Junny Li, and Xueshan Shan as inventors.

37.     PulseLink owns by assignment the entire right and title in and to the '717 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

38.     The written description of the '717 patent describes in technical detail each limitation of the claims, including claim 1, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

39.     The '717 patent claims are directed to addressing problems specific to wireless communication networking technologies, including the inability to provide secure, convenient access to enterprise services for mobile users over converged networks. '717 patent at 1:33-35. Specifically, the technical challenge arises because prior approaches using passwords and remote logins were inadequate and insecure, often requiring a direct pipe to be established through an enterprise firewall to connect a remote user to internal services. *Id*. at 1:42-53. As the patent explains, these prior approaches could "provide and inadequate level of security," and the lack of security is more notable in advanced enterprise communication applications involving multimodal interaction and multimedia content." *Id*. at 1:49-53.

40.     Additionally, mobile devices at the time suffered from limited resources and the inefficiency of polling-based applications, which wasted wireless network resources and battery power. Manual entry of URIs on mobile devices was also considered time-consuming and clumsy. As such, that patent notes a need for "improved techniques for secure service delivery, service monitoring, and/or notification over converged networks for mobile users." *Id*. at 1:60-62.

41.     The '717 patent provides specific improvements to known technological limitations in networked computer systems by disclosing a Wireless Secure Server (WSS) architecture that

separates authentication and service content generation from content access functions. The patent explains that while the enterprise application remains protected inside the enterprise firewall, the WSS sits outside the firewall to manage interactions with mobile clients. *Id*. at 2:3-18; 3:33-41

42.    To solve the security and usability gaps, the patent describes an improved system that seamlessly couples Wireless Application Protocol ("WAP") push and WAP pull operations. Specifically, the WSS generates push content containing an embedded URI that is invisible to the user and any third party, preventing eavesdroppers from seeing key entries or sensitive access procedures. *Id*. at 1:66-2:19; 2:60-67. The invention provides a "secure information access technique" and "not only provides enhanced security, but also greatly simplifies user access to the content." *Id*. at 10:30-54. This process, described in the patent as "single-key interactive switching," is a significant technological solution and provides a significant enhancement to a user of a mobile client device. *Id*. at 10:53-61. Moreover, the patent further informs that the present invention "allows the delivery of rich and active content to the mobile user without the restrictions on size and content commonly associated with pre-existing solutions. *Id*. at 10:66-11:3.

43.    The patent describes yet further technological solutions provided by the claimed inventions, noting that the server-centric architecture "advantageously avoids the need for client applications while also providing backward compatibility with existing SMS or WAP enabled mobile client devices." Additionally, the patent notes that the invention reduces wireless airtime requirements and the associated costs, while also reducing power consumption of the mobile device. *Id*. at 11:4-16.

44.    Claim 1 of the '717 patent provides specific details supporting why the inventive concept described in the patent provides a specific "how" for solving pre-existing problems in secure mobile networking. The claim goes well beyond a mere description of secure enterprise connectivity, claiming a specific method that includes generating push content in a server

responsive to information from an enterprise application, where the push content comprises an embedded URI that is "invisible to users of the client device." *Id*. at 13:11-24. Beyond this, the claimed method receives a request for information identified by that invisible URI, which initiates a pull operation to display the information on the client device.

45.     As such, claim 1 of the '717 patent explains how the claimed invention solves the inability to securely and efficiently deliver rich multimedia content without exposing the internal network or requiring complex manual input from the user. The inventive benefits of the '717 patent over prior solutions stem from its server-centric architecture and the use of invisible embedded URIs to facilitate single-key interactive switching. This approach allows a user to move from a push notification to detailed content (pull) with a single operation, significantly enhancing usability while ensuring that sensitive access codes and locations remain hidden. The claimed features collectively overcome the known inefficiencies of polling and the security risks of direct firewall penetration, allowing for secure, device-independent delivery of enterprise services over wireless networks.

### U.S. Patent No. 9,900,553

46.     The '553 patent, entitled "Multi-stream video switching with selective optimized composite," lawfully issued on February 20, 2018. A true and correct copy of the '553 patent is attached as Exhibit 2.

47.     The '553 patent names Stephen R. Whynot as inventor.

48.     PulseLink owns by assignment the entire right and title in and to the '553 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

49.     The written description of the '553 patent describes in detailed technical terms each limitation of the claims, including claim 8, enabling a person of ordinary skill in the art to

understand both the scope of the claims and how its non-conventional and non-generic combination of computer-implemented method steps departs from and improves upon what was considered conventional in video-based telecommunications at the time of the invention.

50.     Claim 8 of the '553 patent is directed to addressing concrete, technology-specific problems arising from a recognized bottleneck in video-based conferencing systems. Specifically, the inability of prior-art systems to scale efficiently while maintaining acceptable bandwidth usage, latency, and resource utilization as the number of conference participants changes during an active session. At the time of the invention, existing approaches fell into two categories: (i) "multi-stream/multi-spatial video switching architectures" and (ii) "[t]raditional video conference solutions." '553 patent at 1:21-38.

51.     As described in the specification, the inventor recognized that multi-stream and multi-spatial video switching architectures suffered from significant technical shortcomings, including "higher bandwidth usage as the number of participants increases" and the limitation that "any single stream devices are limited to one participant." *Id*. at 1:25–28. The inventor further recognized that traditional video conferencing solutions introduced different but equally significant technical deficiencies, including "scalability issues, high latency, less efficient use of resources, and less flexibility in window placement on the endpoints." *Id*. at 1:35–38. The '553 patent explains that prior art systems were technically rigid; for example, in traditional systems, "decoding would be on a high resolution (e.g., 720p or higher) stream from each endpoint, which requires more resources (this is where hardware acceleration and digital signal processors are typically deployed)." *Id*. at 2:38-42. The claimed invention solves this by allowing "optimal spatial video layer[s] [to] be used for decoding... [providing] much greater scale, and the ability to process video efficiently in software." *Id*. at 2:31-37.

52.    Claim 8 is directed to a specific way of operating a video-conferencing system that overcomes these technical limitations by enabling the system to dynamically add or remove shared video-processing resources while the conference is already in progress. Rather than fixing video-processing resources in advance, the claimed method employs a software-implemented switching fabric and a controller to connect participating devices to shared processing resources as needed. As the number of participants changes during an active conference, the controller automatically adjusts which processing resources are connected, without interrupting the conference session. The '553 patent identifies the "processing resources backplane" as part of a specialized "combined multi-stream switching fabric" which may correspond to a "back-to-back media relay" where "each session is assigned a unique SSRC, timestamp, sequence number and SRTP security context to mask the dynamic nature of the switching fabric resources." *Id*. at 1:47-3:4; 8:27-67; This specific architectural arrangement allows resources to be 'added behind the switching fabric on demand and only when required (e.g., when video switching is not adequate), thereby lowering the video processing resource requirements even further." *Id*. at 2:42-47.

53.    In other words, claim 8 is directed to a conferencing method that flexibly scales up or down during a live meeting by intelligently routing participants to shared video-processing resources, thereby improving efficiency, scalability, and performance of the conferencing system itself. To achieve this improvement, claim 8 recites a specific, computer-implemented sequence of operations that is not conventional or generic, including: (i) providing a software-implemented switching fabric that interconnects conference participants with a processing-resources backplane; (ii) selectively deploying a cluster of processing resources that can be dynamically added to or removed from the conference while the conference remains in progress; and (iii) controlling the dynamic connection and disconnection of those processing resources based on the number of communication devices involved in the conference. As such, claim 8 is directed to a concrete

technological solution that improves the functioning of video-conferencing systems, rather than to an abstract idea.

54.    The combination of limitations recited in claim 8 was not well-understood, routine, or conventional at the time of the invention. As reflected in the specification, prior-art video-conferencing systems relied on static (multi-stream OR traditional video) architectures in which media processing resources were provisioned in advance and fixed for the duration of a conference. *Id*. at 1:25-28, 1:35-38. As described in the Background of the '553 patent, prior video-conferencing systems operated either using multi-stream/multi-spatial switching architectures or traditional composited conferencing architectures, each with inherent limitations related to bandwidth usage, scalability, latency, and resource efficiency, and did not provide a mechanism for dynamically combining or reallocating processing resources during an active conference. *Id*. at 1:21–38, 1:41–45.

55.    In contrast, claim 8 recites a non-conventional method that departs from these prior techniques by introducing a software-implemented switching fabric and processing-resources backplane that decouples participant devices from media processing resources and permits those resources to be dynamically connected and disconnected while the conference is already in progress. At the time of the invention, it was not well-understood, routine or conventional to modify the allocation of shared video decoding, compositing, and encoding resources mid-conference without reinitializing the session or requiring all endpoints to renegotiate streams.

56.    Nor was it conventional to employ a controller, operating in conjunction with such a switching fabric, to dynamically adjust the deployment of a cluster of processing resources based on the changing number of communication devices involved in a live conference. As explained in the specification, prior systems either scaled poorly as participant counts increased or required

over-provisioning of resources up front, resulting in inefficient use of bandwidth and processing capacity. *Id*. at 2:46-47 ("resources are required up front or the call is rejected").

57.    The '553 overcame this problem by, for example, employing a media server that acts as a dynamic elastic bridge, where each participant is "anchored to the switching fabric" via specific ports. *Id*. at 9:20-22. Unlike conventional systems that require session re-initialization to change resource allocation, the claimed architecture allows the controller to "connect more or fewer processing resources" via a backplane as demands change mid-session. *Id*. at 9:13-17. To ensure this mid-conference scaling is seamless and invisible to the endpoints, the switching fabric, in some embodiments, manages unique "SSRC, timestamp, sequence numbers, SRTP security contexts, and/or SDP negotiation options" for each participant's endpoint. *Id*. at 9:20-25. This specific technical mechanism "mask[s] the dynamic nature of the switching fabric resources," allowing individual devices to maintain their unique connection parameters while simultaneously "receiv[ing] the benefits of shared processing resources" that are scaled on-demand. *Id*. at 1:55-57, 9:25-29; *see also id*. at 9:1-45.

58.    Claim 8's method of selectively deploying and withdrawing processing resources during an active session represented a departure from those conventional design constraints. The claimed method is not a generic automation of a manual process. As described in the specification, the controller manages the cluster of processing resources to perform a specific packing function, e.g., if a participant limit is exceeded, the system identifies the "two least active speaker streams [to] be composited" while ensuring the "active talker is switched and remains in a window that utilizes very low latency, thereby maintaining an acceptable video conferencing experience." *Id*. at 2:5-20; *see also id*. at 9:1-45. This specific prioritization and 'on demand' compositing logic represents a technical departure from the known but non-conventional "dual hybrid solutions with a Multi-Point Control Unit (MCU) and a cascading media server." *Id*. at 1:58-3:4.

59.     The ordered combination of steps in claim 8 therefore reflects more than the use of generic computing components performing their ordinary functions. Instead, the claim recites a specific architectural arrangement and sequence of operations, e.g., software-based switching, dynamic resource backplane interconnection, and controller-driven mid-conference reconfiguration, that were not employed in conventional video-conferencing systems. These features operate together to improve scalability, reduce latency, and improve bandwidth and processing efficiency in a manner that was neither routine nor well-understood in the art.

60.     The '553 patent explicitly contrasts the claimed invention with "existing 'dual' hybrid solutions" with an MCU and a cascading media server, noting that the claimed solution provides a "video switching fabric at the core of a video conference" combined with "embedded optimized on-demand compositing" is "less complex and less costly to implement" than cascading media servers. *Id*. at 2:53-3:4. This integration of a software switching fabric with a dynamic processing backplane was not well-understood, routine, or conventional. Moreover, the "software framework" of the switching fabric in claim 8 is not a generic computer program, but a specialized back-to-back media relay architecture. By managing these specific network-level identifiers, the framework allows the claimed "processing resources" to be added or removed mid-conference without dropping the session or requiring endpoint renegotiation. This specific technical implementation enables the "on demand" transition from low-latency switching to bandwidth-efficient compositing, thereby improving the internal operation of the video conferencing system in a manner that was neither routine nor conventional.

### U.S. Patent No. 10,080,231

61.     The '231 patent, entitled "Channel bandwidth optimization for dynamic network conditions," lawfully issued on September 18, 2018. A true and correct copy of the '231 patent is attached as Exhibit 3.

62.     The '231 patent names Oren Backshe, Eyal Sayar, Gal Keren, and Ori Modai as inventors.

63.     PulseLink owns by assignment the entire right and title in and to the '231 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

64.     The written description of the '231 patent describes in technical detail each limitation of the claims, including claim 1, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

65.     The '231 patent claims are directed to addressing problems specific to particular communication networking technologies, including the inability to optimize channel bandwidth in a dynamic network environment without suffering packet loss or artificially reducing quality. '231 patent at 1:14-42. Specifically, the technical challenge arises because bandwidth estimators at the time of the invention could not respond quickly enough when a data channel increases its bitrate to greater than what the available bandwidth allows. *Id*. at 1:36-39. Consequently, packets are lost, which degrades quality and causes a degradation of the user experience in the system at the receiving end of the data channel. *Id*. at 1:39-42.

66.     The '231 patent provides specific improvements to known technological limitations in networked computer systems and pre-existing network bandwidth estimators used therewith. The patent explains, for example, that while an ideal scenario for the data channel would be to use as much as possible of the bandwidth available, dynamic constraints made this difficult to achieve at the time of the invention. The patent explains that if a stream attempts to increase its transfer rate, the bandwidth needed to transfer at that increased rate may not be available due to the

bandwidth currently being used by other data streams. *Id*. at 1:19-23. This leads to lost or delayed data packets. Conversely, the quality of the information in the data may suffer if the bandwidth used by the data stream is kept artificially low to ensure the available bandwidth is not exceeded. This created a technical gap where systems at the time were forced to choose between packet loss from over-utilization and poor quality from under-utilization. *Id*. at 3:10-30.

67.     The '231 patent specification discusses the technological solution provided by the patent to these known networking problems, disclosing methods and systems that optimize bandwidth usage by a data channel over a communication network. The patent describes, for example, that when sender system and receiver system exchange data via a network. The data is transmitted at a first rate that consumes at least a portion of the bandwidth available. *Id*. at 5:8-27. While the bandwidth available may be constant or variable, the portion available to a specific channel may be dynamic depending on the rate in which other data channels in the network are transferring data. This can result in uncertainty about whether enough bandwidth is available for a higher rate of transmission. *Id*. at 5:19-28. To address this uncertainty, the patent describes a process where the sender system attempts to transfer data at a higher rate by increasing the transfer rate in increments until either the second rate is achieved or the available amount of bandwidth is reached. *Id*. at 5:29-64; *see also id.* at 6:6-55. Because the exact amount of available bandwidth is unknown in a dynamic network environment, increasing the rate in gradual increments prevents the sender system from going too far over the available amount of bandwidth, thus avoiding quality impairments.

68.     Claim 1 of the '231 patent provides specific details supporting how the invention provides a specific how for solving the pre-existing problems in network management discussed above. The claim goes well beyond a description of "optimizing channel bandwidth usage in a communication network," claiming that after determining that the first data channel is attempting

to transmit at a second higher rate, the claimed method increases "from the first rate to the second rate in increments until either the second rate is achieved or the available amount of bandwidth is reached, wherein the second sender does not know whether the second rate can be achieved within the available amount of bandwidth until either the second rate is achieved or the available amount of bandwidth is reached." *Id*. at 10:46-54. Claim 1 thus provides an express technological solution to the pre-existing inability to optimize channel bandwidth in a dynamic network environment without suffering packet loss or artificially reducing quality

69. As such, the inventive benefits of the '231 patent over prior solutions primarily stem from its approach of utilizing incremental rate increases, rather than simply transferring the first data channel at the second rate, which could end up going over the available amount of bandwidth. The claimed features of the '231 patent collectively overcome the inefficiencies and inflexibility of prior estimators used in communication networks, allowing the sender system to substantially maximize the data transfer rate on a data channel when the amount of bandwidth available to that channel is dynamic.

## ACCUSED PRODUCT AND ACTIVITIES

70. Zoom, founded in 2011, created and operates leading communications platforms, including videoconferencing and cloud telephony services, that enable users to conduct virtual meetings, webinars, telephone calls and collaborative sessions, supporting both individual and enterprise customers across a wide range of industries.

71. Zoom's videoconferencing platform (the "Accused Product") is or has been marketed under various names including "Zoom Workplace," "Zoom Meetings," and "Zoom One." The Accused Product includes functionality supported by the platform and potentially marketed under names such as "Zoom Rooms," "Zoom Sessions," and "Zoom Webinars." The Accused Product also includes Zoom products, services, and offerings that build on the platform,

such as "Zoom Node, "Zoom Mesh" and "Zoom Meetings Hybrid."  The Accused Product includes the foregoing marketed as a product and/or service.

72.    Zoom's videoconferencing platform operates through Zoom's datacenters in multiple locations in the United States and others around the world.

73.    Zoom's videoconferencing platform is accessible through a variety of Zoom-provided interfaces, including web-based portals and downloadable applications for computers, tablets, mobile devices, touchscreen displays, and conference room controllers.

74.    Charts showing exemplary infringing functionality and use are shown in Exhibits 4-6. As shown in Exhibits 4-6, Zoom performs every step of the asserted method claims.

75.    As a sophisticated operator of a leading communications systems, Zoom prioritizes, invests in, and touts the performance and reliability of its videoconferencing platform. Zoom states that its "innovative approach in delivery and features provides a consistently superior video conferencing experience. End users appreciate the innovative features, ease of use, reliability and incredible video and audio clarity. And IT managers are assured that the solution is globally available and designed to scale with security and dependability."[23]

76.    According to Zoom, "Zoom has brokers and communications servers distributed among multiple interconnected data centers across the globe. We are constantly evaluating our data centers and Internet service providers (ISPs) to optimize performance for our customers in regards to bandwidth, latency, and disaster recovery isolation. Our data centers are situated in secure co-location facilities that are ISP carrier neutral and provide physical security, redundant power, and simultaneous access to top-tier ISPs and peering partners. We also have certain deployments on public cloud providers where regional or capacity requirements warrant. Our co-location facilities are built with fault-tolerant architecture with full redundancy and rapid failover

---

[23] https://library.zoom.com/admin-corner/architecture-and-design/zoom-architected-for-reliability.

capability. Zoom dynamically load balances the communications servers to automatically move new sessions to the data center that has the best response time."[24]

77.    Zoom further touts that it "maintains 50% excess capacity in all aspects of our infrastructure to accommodate our growing business and to meet peak usage requirements."[25]

78.    Zoom mandates that participants in its videoconferencing sessions utilize its proprietary Zoom Client software. The installation and configuration of this software on a user's device is a functional prerequisite for accessing and participating in Zoom Meetings. Zoom's platform is designed as a closed ecosystem, typically precluding the use of third-party or competing client software, such as Microsoft Teams or Cisco Webex, to interface with or participate in collaborative sessions hosted on the Zoom Meetings infrastructure. Consequently, Zoom exercises exclusive control over the software interface through which users access the Accused Product. Zoom derives substantial revenue from the commercial exploitation of its proprietary videoconferencing platform, the utility of which is fundamentally predicated on the integration and deployment of the Zoom Client software. Zoom receives a direct financial and operational benefit from the presence of each individual client within its network; as the participation of each client increases the platform's connectivity, Zoom's "network effect" enhances the overall commercial value of its ecosystem. Furthermore, Zoom exercises exclusive direction and control over the entire videoconferencing infrastructure. Zoom dictates the technical standards, communication protocols, and software versioning requirements necessary for a device to interface with its servers, thereby ensuring that Zoom maintains total control over the infringing methods executed across its system.

79.    Upon information and belief, Zoom contracts with customers, end users, resellers and others, to provide or sell the infringing Zoom Meetings software and/or devices, including, for

---

[24] https://library.zoom.com/admin-corner/architecture-and-design/zoom-architected-for-reliability.
[25] https://library.zoom.com/admin-corner/architecture-and-design/zoom-architected-for-reliability.

example, computers with Zoom specified capabilities and internet access, with Zoom Meetings software within this District and elsewhere.

80. A contractual relationship exists between Zoom and its customers and users. For example, Zoom's "Terms of Service" and Zoom's "Services Description" collectively are an "Agreement" between Zoom and its customers and users. Zoom conditions a customer's or user's "access to and use of" Zoom Meetings and specifies that customers or users "may only use the Services and Software[, including Zoom Meetings], in accordance with the terms and subject to the conditions of this Agreement." In order to create an account to access Zoom Meetings, Zoom requires users to agree that they "will only create an account or otherwise use the Services and Software if [they] agree to be legally bound by all terms and conditions" unilaterally required by Zoom for use of the Accused Product.

81. Zoom contractually requires users to register in a specific manner, prohibits account sharing, sets forth an order form for ordering services, requires a minimum commitment, requires the download, use and installation of Zoom software (which includes Zoom Meetings software), provides that Zoom can revoke access to and use of Zoom Meetings at its sole discretion, requires users to acknowledge they "neither obtained nor will obtain any ownership or other right, title, or interest in or to the Services, Software, or Documentation or any Proprietary Rights relating thereto," which includes Zoom Meetings, requires that "[a]ny copies of Software[,including Zoom Meetings software], will remain the exclusive property of Zoom," specifies the types of devices on which Zoom Meetings is permitted to be used and requires customers and users to obtain software updates, including for Zoom Meetings. Zoom also requires users to agree to an extensive list of prohibited uses of Zoom Meetings. Zoom further specifies a list of Zoom permitted uses of its users' content, which includes Zoom Meetings.

82. Zoom's "Zoom Services Description" applies to Zoom Meetings and related

26

hardware that Zoom provides to customers and or end users. The Zoom Services Description provides that Zoom services, including Zoom Meetings and related hardware for operation and use of same, may be ordered through a Zoom Order Form, through a Reseller Customer Agreement, or provided by Zoom. The Zoom Services Description specifies the manner of use of Zoom Meetings, including the requirement of at least one host, and requires that customers and users of Zoom's Hardware-as-a-Service Program ("HaaS Program") sub-lease certain devices in conjunction with and for the same subscription term as an associated underlying subscription for Zoom Meetings.

83.     Zoom's Acceptable Use Guidelines also restrict the type of uses and the content customers and users may provide via Zoom Meetings, with violations of its guidelines resulting in termination of the agreement with Zoom and/or the blocking any such customer or user from Zoom Meetings.

84.     Upon information and belief, Zoom also contracts with resellers to sell or provide the Accused Product within this District and elsewhere. Zoom sells or contracts with others to sell the Accused Product, including devices preloaded with Zoom Meetings, such as, for example, hardware provided as part of HaaS and Zoom Rooms. The Zoom Reseller Customer Terms of Service conditions access to the Accused Product by requiring compatible devices, internet access, certain software, and required updates and upgrades for Zoom Meetings. That agreement governs, at least in part, ordering, acquisition, accessing, and use of the Accused Product and includes prohibited uses.

85.     Zoom also uses the Accused Product to collect certain data about customers and users and their use of Accused Product, including product-usage, telemetry, diagnostic, account, device, interaction, and partner-enrichment data, and uses such data for business purposes including product improvement, analytics, security, customer support, marketing, advertising, and

27

sales-related activities.

86.    Zoom further provides software for the use of Zoom Meetings to infringing customers and users and instructions to such customers and user on how to use and operate the Accused Product in an infringing manner, including, for example, at https://support.zoom.com/hc and https://support.zoom.com/hc/en/meetings?id=meetings. Such instructions include, for example, written instructions and manuals, videos and tutorials, and learning paths on how to use and operate Zoom Meetings.

87.    To the extent that an element of a claim is performed by a different party than Zoom, Zoom—through its software and infringing devices—participates in the infringement (as described herein and the attached claim charts) and receives a benefit upon performance of the steps of the patented method. For example, Zoom provides the software that establishes the manner and/or timing of the performance of the steps, such software the Zoom specifies and software that initiates the Zoom Meetings session and results in the infringement identified in Exhibits 4-6, including software establishing a communication link or other actions that a user may request or result from a user's actions. Zoom receives a benefit from such actions by the customer or end user as it allows it to provide a product that would be desired or allows customers or end users to purchase products and services from Zoom. Zoom's contracts with a user also create an agency relationship or governs infringing activity for the purposes of joint infringement. All steps of each claimed method are performed by or attributable to Zoom and are under Zoom's direction or control.

**ZOOM'S PRE-SUIT KNOWLEDGE OF THE ASSERTED PATENTS**

88.    Upon information and belief, Zoom has had knowledge and notice of the Asserted Patents, and its infringement thereof, since the patents issued. Upon information and belief Zoom, as a technology company, regularly monitors video collaboration/conferencing and cloud-based VoIP telephony and PBX-style call-handling technology advances, and it monitored or was

otherwise aware of the Asserted Patents, especially due to their impact on Zoom's plans for its own business and given its prior competitive relationship with Avaya, Inc.

89.     Further, prior to the filing of the Complaint, PulseLink attempted to engage Zoom in good faith licensing discussions related to the Asserted Patents, including by sending Zoom correspondence on March 27, 2026 notifying Zoom of the need to license the Asserted Patents, among others. PulseLink notified Zoom of each Asserted Patent via email and Certified Mail (Return Receipt Requested). PulseLink informed Zoom that PulseLink's patent portfolio, including the Asserted Patents, addressed foundational aspects of modern communication systems, that meaningful alignment existed between aspects of Zoom's products, including Zoom Meetings, and technologies covered by the patent portfolio, including network traversal, session management, adaptive media optimization, and multi-participant real-time processing. PulseLink specifically identified each Asserted Patent to Zoom. PulseLink requested Zoom to engage in licensing discussions.

90.     Despite having knowledge of the Asserted Patents prior to this Complaint being filed, upon information and belief, Zoom has never undertaken any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Zoom has continued to infringe one or more claims of the Asserted Patents.

91.     Alternatively, to the extent that Zoom avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, it was willfully blind. Upon information and belief, to the extent it lacked actual knowledge of infringement, prior to the filing of this action, Zoom deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that it infringed PulseLink's patents, and specifically the Asserted Patents, and was therefore willfully blind. Upon information and belief, Zoom lacks written policies disseminated to employees regarding monitoring or avoidance of patent infringement by

Zoom and lacks mechanisms for employees to report patents which they believe Zoom may infringe. Upon information and belief, Zoom and its employees subjectively understood that there was a high likelihood that patents filed on innovations covered by the Asserted Patents read on the Accused Product.

92.    At least as of the commencement of this action, Zoom has both actual knowledge of the Asserted Patents and notice of its infringement thereof and continues to willfully infringe.

93.    Therefore, upon information and belief, Zoom's infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate, entitling Zoom to increased damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## COUNT I
## Infringement of the '717 Patent

94.    PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

95.    PulseLink has not licensed or otherwise authorized Zoom to make, use, offer for sale, sell, or import any products that embody the inventions of the '717 patent.

96.    In violation of 35 U.S.C. § 271(a), Zoom has directly infringed the '717 patent by making, using, selling, and/or offering for sale in the United States and/or importing into the United States, without authority, the Accused Product which practices each and every limitation of at least claim 1 of the '717 patent. Zoom has infringed literally and/or under the doctrine of equivalents. Zoom's liability for direct infringement of the '717 patent includes Zoom's provision, sale, offer to sell, and/or use of the Accused Product to serve outside customers and users, to serve Zoom's internal users, and to perform testing and improvement of the Accused Product.

97.    Claim 1 of the '717 patent is reproduced below:

30

1. A method comprising:

generating push content in a server, responsive to information received in the server from an enterprise application, wherein:

(i) the push content is delivered from the server to a client device over a wireless network,

(ii) the push content comprises an embedded uniform resource identifier (URI) that identifies information, and

(iii) the uniform resource identifier (URI) is embedded in the push content such that the uniform resource identifier (URI) is invisible to users of the client device; and

receiving in the server from the client device, responsive to the push content that comprises the uniform resource identifier (URI), a request for the information that is identified by the uniform resource identifier (URI);

wherein the request initiates a pull operation that pulls the information that is identified by the uniform resource identifier (URI) and displays the information that is identified by the uniform resource identifier (URI) on the client device.

98.    Zoom and the Accused Product directly infringes as shown, for example, in Exhibit 4.

99.    Zoom controls the entire videoconferencing platform for the Accused Product and benefits from it.

100.    Zoom has indirectly infringed and continues to indirectly infringe at least claim 1 of the '717 patent under 35 U.S.C. § 271(b). Zoom has known of the '717 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement by others, such as Zoom's customers and users, in this District and elsewhere in the United States. For example, Zoom's customers and users directly infringe through their use of the Accused Product that includes the inventions claimed in the '717 patent, including at least claim 1 as shown in Exhibit 4. Zoom intends to cause, and has taken affirmative steps to induce infringement by its customers and users by at least creating or continuing to run advertisements that promote the

infringing use of the Accused Product, creating and maintaining established distribution channels for the Accused Product into and within the United States, distributing or making available the Zoom Client and instructions or manuals for the Accused Product to customers and users, testing the Accused Product, and/or providing technical support or services for the Accused Product to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the Accused Product at zoom.us, zoom.com, and support.zoom.com. Zoom's website provided, and continues to provide, instructions for using the Accused Product in a manner that results in infringement of the '717 patent. As a result of Zoom's inducement, Zoom's customers and users use the Accused Product in the way Zoom intends and directly infringe the '717 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import and sell the Accused Product, despite its knowledge of the '717 patent, thereby specifically intending for and inducing customers and users to infringe the '717 patent through their normal and customary use of the Accused Product. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the '717 patent in the United States because Zoom had knowledge of the '717 patent and actively induced others (e.g. its customers and users) to directly infringe the '717 patent.

101.    As alleged above, Zoom had prior knowledge of the '717 patent and knew, should have known, or was willfully blind to the fact of Zoom's infringement of the '717 patent since that time.

102.    The Accused Product satisfies all limitations of at least claim 1 of the '717 patent.

103.    Zoom derives revenue, directly and indirectly, from activities related to the

Accused Product and by infringing the '717 patent in this District and elsewhere.

104.    By reason of Zoom's infringement, PulseLink has suffered substantial damages.

105.    PulseLink is entitled to recover the damages sustained as a result of Zoom's wrongful acts in an amount subject to proof at trial.

**COUNT II**
**Infringement of the '553 Patent**

106.    PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

107.    PulseLink has not licensed or otherwise authorized Zoom to make, use, offer for sale, sell, or import any products that embody the inventions of the '553 patent.

108.    In violation of 35 U.S.C. § 271(a), Zoom has directly infringed the '553 patent by making, using, selling, and/or offering for sale in the United States and/or importing into the United States, without authority, the Accused Product which practices each and every limitation of at least claim 8 of the '553 patent. Zoom has infringed literally and/or under the doctrine of equivalents. Zoom's liability for direct infringement of the '553 patent includes Zoom's provision, sale, offer to sell, and/or use of the Accused Product to serve outside customers and users, to serve Zoom's internal users, and to perform testing and improvement of the Accused Product.

109.    Claim 8 of the '553 patent is reproduced below:

8. A method, comprising:

providing, by a microprocessor, a switching fabric as a software framework for an interconnection between a plurality of communication devices involved in a conference and a processing resources backplane that enables a selective deployment of processing resources to the conference, wherein the switching fabric connects a plurality of ports to each of the plurality of communication devices, respectively, and wherein the processing resources backplane connects one or more network interfaces to the processing resources; and

controlling, by the microprocessor, a controller that controls connections between endpoints and the processing resources backplane of the switching fabric based on a number of communication devices involved in the conference, wherein the microprocessor controls one of a plurality of controllers included in a cluster of media

controllers and wherein the processing resources are a cluster of processing resources that are dynamically added and removed from the conference while the conference is in progress.

110. Zoom and the Accused Product directly infringes as shown, for example, in Exhibit 5.

111. Zoom controls the entire videoconferencing platform for the Accused Product and benefits from it.

112. Zoom has indirectly infringed and continues to indirectly infringe at least claim 8 of the '553 patent under 35 U.S.C. § 271(b). Zoom has known of the '553 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement by others, such as Zoom's customers and users, in this District and elsewhere in the United States. For example, Zoom's customers and users directly infringe through their use of the Accused Product that includes the inventions claimed in the '553 patent, including at least claim 8 as shown in Exhibit 5. Zoom intends to cause, and has taken affirmative steps to induce infringement by its customers and users by at least creating or continuing to run advertisements that promote the infringing use of the Accused Product, creating and maintaining established distribution channels for the Accused Product into and within the United States, distributing or making available the Zoom Client and instructions or manuals for the Accused Product to customers and users, testing the Accused Product, and/or providing technical support or services for the Accused Product to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the Accused Product at zoom.us, zoom.com, and support.zoom.com. Zoom's website provided, and continues to provide, instructions for using the Accused Product in a manner that results in infringement of the '553 patent. As a result of Zoom's inducement, Zoom's customers and users use the Accused Product in the way Zoom intends and

directly infringe the '553 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import and sell the Accused Product, despite its knowledge of the '553 patent, thereby specifically intending for and inducing customers and users to infringe the '553 patent through their normal and customary use of the Accused Product. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the '553 patent in the United States because Zoom had knowledge of the '553 patent and actively induced others (e.g. its customers and users) to directly infringe the '553 patent.

113.    As alleged above, Zoom had prior knowledge of the '553 patent and knew, should have known, or was willfully blind to the fact of Zoom's infringement of the '553 patent since that time.

114.    The Accused Product satisfies all limitations of at least claim 8 of the '553 patent.

115.    Zoom derives revenue, directly and indirectly, from activities related to the Accused Product and by infringing the '553 patent in this District and elsewhere.

116.    By reason of Zoom's infringement, PulseLink has suffered substantial damages.

117.    PulseLink is entitled to recover the damages sustained as a result of Zoom's wrongful acts in an amount subject to proof at trial.

### COUNT III
### Infringement of the '231 Patent

118.    PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

119.    PulseLink has not licensed or otherwise authorized Zoom to make, use, offer for sale, sell, or import any products that embody the inventions of the '231 patent.

35

120.    In violation of 35 U.S.C. § 271(a), Zoom has directly infringed the '231 patent by making, using, selling, and/or offering for sale in the United States and/or importing into the United States, without authority, the Accused Product which practices each and every limitation of at least claim 1 of the '231 patent. Zoom has infringed literally and/or under the doctrine of equivalents. Zoom's liability for direct infringement of the '231 patent includes Zoom's provision, sale, offer to sell, and/or use of the Accused Product to serve outside customers and users, to serve Zoom's internal users, and to perform testing and improvement of the Accused Product.

121.    Claim 1 of the '231 patent is reproduced below:

1. A method of optimizing channel bandwidth usage in a communication network from a sender, the method comprising:

transmitting first data on a first data channel from the sender to a receiver at a first rate that does not exceed an available amount of bandwidth on the communication network;

determining that the first data channel is attempting to transmit at a second rate that is higher than the first rate; and

continuing to transmit the first data on the first data channel while increasing from the first rate to the second rate in increments until either the second rate is achieved or the available amount of bandwidth is reached, wherein the sender does not know whether the second rate can be achieved within the available amount of bandwidth until either the second rate is achieved or the available amount of bandwidth is reached.

122.    Zoom and the Accused Product directly infringes as shown, for example, in Exhibit 6.

123.    Zoom controls the entire videoconferencing platform for the Accused Product and benefits from it.

124.    Zoom has indirectly infringed and continues to indirectly infringe at least claim 1 of the '231 patent under 35 U.S.C. § 271(b). Zoom has known of the '231 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement

by others, such as Zoom's customers and users, in this District and elsewhere in the United States. For example, Zoom's customers and users directly infringe through their use of the Accused Product that includes the inventions claimed in the '231 patent, including at least claim 1 as shown in Exhibit 6. Zoom intends to cause, and has taken affirmative steps to induce infringement by its customers and users by at least creating or continuing to run advertisements that promote the infringing use of the Accused Product, creating and maintaining established distribution channels for the Accused Product into and within the United States, distributing or making available the Zoom Client and instructions or manuals for the Accused Product to customers and users, testing the Accused Product, and/or providing technical support or services for the Accused Product to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the Accused Product at zoom.us, zoom.com, and support.zoom.com. Zoom's website provided, and continues to provide, instructions for using the Accused Product in a manner that results in infringement of the '231 patent. As a result of Zoom's inducement, Zoom's customers and users use the Accused Product in the way Zoom intends and directly infringe the '231 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import and sell the Accused Product, despite its knowledge of the '231 patent, thereby specifically intending for and inducing customers and users to infringe the '231 patent through their normal and customary use of the Accused Product. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the '231 patent in the United States because Zoom had knowledge of the '231 patent and actively induced others (e.g. its customers and users) to directly infringe the '231 patent.

125.    As alleged above, Zoom had prior knowledge of the '231 patent and knew, should have known, or was willfully blind to the fact of Zoom's infringement of the '231 patent since that time.

126.    The Accused Product satisfies all limitations of at least claim 1 of the '231 patent.

127.    Zoom derives revenue, directly and indirectly, from activities related to the Accused Product and by infringing the '231 patent in this District and elsewhere.

128.    By reason of Zoom's infringement, PulseLink has suffered substantial damages.

129.    PulseLink is entitled to recover the damages sustained as a result of Zoom's wrongful acts in an amount subject to proof at trial.

## COMPLIANCE WITH 35 U.S.C. § 287

130.    PulseLink has complied with the requirements of 35 U.S.C. § 287(a). With respect to each Asserted Patent, PulseLink has not made, offered for sale, or sold any products in the United States and has not imported any products into the United States that are subject to the marking requirements of 35 U.S.C. § 287(a). Moreover, PulseLink is only presently asserting method claims from the Asserted Patents. The marking requirement of 35 U.S.C. § 287(a) does not apply when a patentee only asserts infringement of method claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

a.    A judgment that Zoom has infringed, directly and indirectly, by way of inducement, literally or under the doctrine of equivalents, one or more claims of the '717 patent;

b.    A judgment that Zoom has infringed, directly and indirectly, by way of inducement, literally or under the doctrine of equivalents, one or more claims of the '553 patent;

c.    A judgment that Zoom has infringed, directly and indirectly, by way of inducement, literally or under the doctrine of equivalents, one or more claims of the '231 patent;

d.    An award of damages to which PulseLink is entitled under 35 U.S.C. § 284 for Zoom's past infringement and any continuing or future infringement post-trial up until the date a final judgment is entered, including both compensatory damages and enhanced damages for willful infringement;

e.     PulseLink's actual damages in an amount sufficient to compensate PulseLink for Zoom's infringement of the Asserted Patents until such time as Zoom ceases its infringing conduct, including supplemental damages post-verdict;

f.     A judgment and order against Zoom for exemplary damages as determined by the trier of fact;

g.     A judgment that Zoom's infringement has been willful;

h.     Pre- and post-judgment interest as allowed by law on any damages awarded to PulseLink;

i.     A declaration that this action is exceptional pursuant to 35 U.S.C. § 285, and an award to PulseLink of its attorneys' fees, costs, and expenses incurred in connection with this action;

j.     A judgment and order requiring Zoom to pay PulseLink compulsory ongoing licensing fees, as determined by the Court in equity; and

k.     Such other and further relief as this Court shall deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PulseLink hereby demands a trial by jury as to all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff's investigation is ongoing, and certain material information remains in the sole possession of the Defendants or third parties, which will be obtained via discovery herein. Plaintiff expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

Dated: April 27, 2026

Respectfully submitted,

By: /s/ Blair M. Jacobs by permission
Claire A. Henry
Blair M. Jacobs
Virginia Bar No. 32010
bjacobs@bsfllp.com
Christina A. Ondrick

Virginia Bar No. 45736
condrick@bsfllp.com
John S. Holley
Texas Bar No. 24078678
jholley@bsfllp.com
John Wittenzellner
Pennsylvania Bar. No. 308996
jwittenzellner@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. N.W.
Washington D.C. 20005
Tel: (202) 237-2727
Fax:  (202) 237-6131

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Claire A. Henry
Texas Bar No. 24053063
claire@millerfairhenry.com
Garrett C. Parish
Texas Bar No. 24125824
garret@millerfairhenry.com
**MILLER FAIR HENRY, PLLC**
1507 Bill Owens Parkway
Longview, Texas  75604
Tel: (903) 757-6400
Fax: (903) 757-2323

*Attorneys for Plaintiff*
*PulseLink Systems, LLC*