**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

PULSELINK SYSTEMS, LLC,

*Plaintiff*,

v.

ZOOM COMMUNICATIONS, INC.,

*Defendant*.

Case No. 2:26-cv-00343-JRG-RSP

**JURY TRIAL DEMANDED**

[redacted]

**DEFENDANT ZOOM COMMUNICATIONS, INC.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TRANSFER UNDER 28 U.S.C. § 1404(a)**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....1
II. BACKGROUND ....1
  A. Plaintiff PulseLink ....1
  B. Defendant Zoom ....2
  C. PulseLink's Infringement Allegations ....2
  D. PulseLink's Venue Allegations ....3
    1. Remote employees ....3
    2. Zoom Node software ....4
    3. Data centers and cloud providers ....5
    4. Reseller (Black Box) ....6
    5. Certification vendor (TekVizion) ....7
    6. TX-RAMP certification ....8
  E. Relevant Prior Art Witnesses ....8
III. VENUE IS NOT PROPER IN THIS DISTRICT ....10
  A. This Case Should Be Dismissed for Improper Venue ....11
    1. Remote employees do not establish venue ....12
      a. Zoom does not own, lease, or control employees' homes ....13
      b. Zoom does not condition employment on residing in this district or require storing materials here ....13
      c. Zoom's business is concentrated outside of this District ....14
      d. Coworking spaces in this District do not create venue ....15
    2. Zoom Node software does not establish venue ....15
    3. Alleged business partners do not establish venue ....16
    4. Zoom's certifications and registrations with the state of Texas do not establish venue ....19
  B. In the alternative, this case should be transferred to the Northern District of California ....19
    1. This case could have been filed in the Northern District of California ....20
    2. The private and public factors favor transfer ....20
      a. The private interest factors favor transfer ....20
      b. The public factors favor transfer ....26

IV. PULSELINK'S INDIRECT INFRINGEMENT CLAIMS SHOULD BE DISMISSED..28

V. CONCLUSION........................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Acer Am. Corp.*,
626 F.3d 1252 (Fed. Cir. 2010).....21, 22

*Adaptix, Inc. v. HTC Corp.*,
937 F. Supp. 2d 867 (E.D. Tex. 2013).....24

*Am. Cyanamid Co. v. Nopco Chem. Co.*,
388 F.2d 818 (4th Cir. 1968).....12

*Andra Grp., LP v. Victoria's Secret Stores, LLC*,
6 F.4th 1283 (Fed. Cir. 2021).....11

*In re Apple Inc.*,
2021 WL 5291804 (Fed. Cir. Nov. 15, 2021).....27

*In re Apple Inc.*,
2022 WL 1196768 (Fed. Cir. Apr. 22, 2022).....23

*In re Apple Inc.*,
979 F.3d 1332 (Fed. Cir. 2020).....27, 28

*Audiopod IP, LLC v. Amazon.com, Inc.*,
No. 2:24-cv-185-AWA, Dkt. No. 65 (E.D. Va. Mar. 31, 2025).....17

*Audiopod IP, LLC v. Amazon.com, Inc.*,
No. 3:24-cv-406-RCY, Dkt. No. 73 (E.D. Va. Mar. 3, 2025).....17

*Celgene Corp. v. Mylan Pharms. Inc.*,
17 F.4th 1111 (Fed. Cir. 2021).....13

*In re Cray Inc.*,
871 F.3d 1355 (Fed. Cir. 2017).....11, 12, 13, 14, 15, 16, 19

*Def. Distributed v. Bruck*,
30 F.4th 414 (5th Cir. 2022).....27

*In re Genentech, Inc.*,
566 F.3d 1338 (Fed. Cir. 2009).....21, 23, 26

*Godo Kaisha IP Bridge 1 v. Xilinx, Inc.*,
No. 2:17-CV-100-JRG-RSP, 2017 WL 4076052 (E.D. Tex. Sept. 14, 2017).....23

*In re Google LLC*,
2021 WL 4427899 (Fed. Cir. Sept. 27, 2021).....28

*In re Google LLC*,
2021 WL 5292267 (Fed. Cir. Nov. 15, 2021).....23

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*In re Google LLC*,
58 F.4th 1379 (Fed. Cir. 2023) ....23

*In re Google LLC*,
949 F.3d 1338 (Fed. Cir. 2020)....11, 16, 17, 19

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
146 S. Ct. 1391 (2026)....29

*In re HP Inc.*,
826 F. App'x 899 (Fed. Cir. 2020) ....27

*In re Juniper Networks, Inc.*,
14 F.4th 1313 (Fed. Cir. 2021) ....21, 25

*Netlist, Inc. v. Micron Tech., Inc.*,
No. 2:25-cv-00558-JRG, Dkt. No. 26 (E.D. Tex. Mar. 6, 2026)....14

*In re Nintendo Co.*,
589 F.3d 1194 (Fed. Cir. 2009)....21, 26

*Pers. Audio, LLC v. Google, Inc.*,
280 F. Supp. 3d 922 (E.D. Tex. 2017)....13, 18

*Rosco, Inc. v. Safety Vision LLC*,
2020 WL 5603794 (S.D.N.Y. Sept. 18, 2020)....15

*In re Samsung Elecs. Co., Ltd.*,
2 F.4th 1371 (Fed. Cir. 2021) ....24

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
581 U.S. 258, 270 (2017)....11

*In re TikTok, Inc.*,
85 F.4th 352 (5th Cir. 2023) ....22, 24, 26

*In re Volkswagen AG*,
371 F.3d 201 (5th Cir. 2004) ....21

*In re Volkswagen Grp. of Am., Inc.*,
28 F.4th 1203 (Fed. Cir. 2022) ....19

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) (en banc) ....20, 21, 26, 27

*Wireless Recognition Techs. LLC v. A9.com, Inc.*,
No. 2:10-cv-364-JRG, 2012 WL 506669 (E.D. Tex. Feb. 15, 2012) ....27

## TABLE OF AUTHORITIES
*(continued)*

Page(s)

*In re ZTE (USA) Inc.*,
890 F.3d 1008 (Fed. Cir. 2018)....................11

### Statutes

28 U.S.C. § 1331....................20

28 U.S.C. § 1338(a)....................20

28 U.S.C. § 1400(b)....................10, 11, 20

28 U.S.C. § 1404(a)....................10, 20

### Rules

Fed. R. Civ. P. 45(c)(1)(A)....................24

Fed. R. Civ. P. 45(c)(1)(B)....................24

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| ’231 patent | U.S. Patent No. 10,080,231, Dkt. No. 1-3 |
| ’553 patent | U.S. Patent No. 9,900,553, Dkt. No. 1-2 |
| ’717 patent | U.S. Patent No. 7,925,717, Dkt. No. 1-1 |
| AWS | Amazon Web Services |
| Elmore Decl. | Declaration of Josh Elmore, dated July 20, 2026. |
| Hu Decl. | Declaration of Hubert Hu, dated July 21, 2026. |
| PulseLink | Plaintiff PulseLink Systems, LLC (unless otherwise specified as another PulseLink affiliate entity) |
| Robins Decl. | Declaration of Kristen Marie Robins, dated July 21, 2026. |
| Zoom | Defendant Zoom Communications, Inc. |

## TABLE OF EXHIBITS

| Exhibit* | Document |
|---|---|
| 1 | Zoom Node Data Sheet |
| 2 | Introduction to Zoom Node |
| 3 | Deploying a Zoom Node Management Server |
| 4 | [redacted] |
| 5 | TX-RAMP Manual |
| 6 | PulseLink Texas Certificate of Formation |
| 7 | PulseLink Home Page |
| 8 | PulseLink Executive Team Page |
| 9 | D. Bitting LinkedIn |
| 10 | S. Tanfield LinkedIn |
| 11 | Zoom 10-K |
| 12 | Prior Art Claim Chart |
| 13 | Cisco US 8,659,636 |
| 14 | Openwave US 6,473,609 |
| 15 | Sony US 7,908,393 |
| 16 | HP US Pub No 2006/0031564 |
| 17 | Sony Interactive Entertainment Home Page |
| 18 | Sony Interactive Entertainment Formation |
| 19 | [Intentionally Omitted] |
| 20 | [Intentionally Omitted] |
| 21 | PulseLink Texas Registration |
| 22 | Equinix DA7 Information |
| 23 | [redacted] |
| 24 | [redacted] |
| 25 | Witness Travel Time |
| 26 | [redacted] |
| 27 | [redacted] |
| 28 | [redacted] |

*All exhibits attached to the declaration of Sung Bin Lee.

# I. INTRODUCTION

This case does not belong in this District. Zoom does not reside in this District and has no place of business here. Unable to identify any actual Zoom place of business in this District, PulseLink relies on allegations about remote employees, software distributed to customers, conjecture about third parties, and a state-issued security certification. None of these are sufficient to support venue in this District, and the case should be dismissed for improper venue.

In the alternative, the case should be transferred to the Northern District of California because it is clearly more convenient. The relevant witnesses and records are concentrated in the Northern District of California, home to Zoom's San Jose headquarters and more than 800 of its employees. The accused features were designed and developed by Zoom engineers in San Jose and China, and the relevant documents, source code, and knowledgeable witnesses are concentrated there. Although PulseLink purports to have a place of business in Allen, Texas, its Texas state filings show a Pennsylvania address, its website lists a Pennsylvania phone number, and its two publicly identified personnel apparently reside in Florida or Pennsylvania. Meanwhile, 19 authors of relevant prior art are located in the Northern District of California or within its subpoena power. These facts warrant transfer.

In addition, PulseLink's boilerplate indirect infringement allegations fail to state a claim under Rule 12(b)(6). PulseLink relies solely on Zoom's ordinary acts of product distribution, advertising, and support, which are inadequate to plead active inducement under the Supreme Court's most recent precedent. Accordingly, the indirect infringement claims should be dismissed.

# II. BACKGROUND

## A. Plaintiff PulseLink

Plaintiff PulseLink is a Texas limited liability company with a purported place of business in Allen, Texas. Compl. ¶ 2. Texas state filings indicate that PulseLink was formed just five

months ago (in February 2026), with an address in Reading, Pennsylvania. Ex. 6 (PulseLink Texas Certificate of Formation). Its website lists a phone number with a Pennsylvania area code. Ex. 7 (PulseLink Home Page listing phone number with "(484)" area code). PulseLink describes itself as a "technology licensing company formed to manage and monetize a portfolio" and does not purport to make or sell any product. *Id.*

PulseLink lists one employee on its website—its founder, Donald S. Bitting—who appears to be based in Florida or Pennsylvania. Ex. 8 (PulseLink Executive Team Page); Ex. 9 (D. Bitting LinkedIn Profile); Ex. 21 (PulseLink Texas Registration). Only one other individual appears to be publicly associated with PulseLink—Sarah Tanfield, who identifies herself as the Director of Operations at PulseLink and appears to be based in Florida. Ex. 10 (S. Tanfield LinkedIn Profile). Thus, PulseLink's only apparent connection to Texas is its Certificate of Formation.

**B. Defendant Zoom**

Defendant Zoom was founded in San Jose, California in April 2011 by Founder & Chief Executive Officer Eric Yuan. Ex. 11 (Zoom Fiscal Year Ending Jan. 2026 10-K) at 14, 26; Elmore Decl. ¶ 3. Zoom remains headquartered there to this day, where more than 800 of its employees work. Elmore Decl. ¶ 7. In the United States, in addition to its San Jose headquarters, Zoom has offices in Denver, Colorado and Seattle, Washington. *Id.* ¶ 5. The 16 executives on Zoom's management team are based predominantly in the San Jose headquarters and in Zoom's Seattle office, with one executive working remotely from Austin, Texas. *Id.* ¶ 11. The Zoom features accused in this case were developed through collaboration between Zoom's engineers located in San Jose and China. Hu Decl. ¶¶ 4–10.

**C. PulseLink's Infringement Allegations**

On April 27, 2026, PulseLink filed this case against Zoom, asserting three former Avaya patents, U.S. Patent Nos. 7,925,717; 9,900,553; and 10,080,231.

PulseLink's allegations are directed to certain features of the Zoom platform. Compl. ¶¶ 35–69. For the '717 patent, titled "Secure interaction between a mobile client device and an enterprise application in a communication system," PulseLink accuses features allegedly related to push notifications and embedded URIs. Dkt. No. 1-4 at 14–15. For the '553 patent, titled "Multi-stream video switching with selective optimized composite," PulseLink accuses features allegedly related to video-processing resource allocation, citing purported interactions between Zoom's infrastructure components called Zone Controller, Multimedia Routers ("MMR"), and Zoom Mesh. *See, e.g.*, Dkt. No. 1-5 at 3. For the '231 patent, titled "Channel bandwidth optimization for dynamic network conditions," PulseLink accuses features allegedly related to bandwidth and quality-of-service ("QoS") management. *See, e.g.*, Dkt. No. 1-6 at 2.

PulseLink also alleges that Zoom induces infringement by advertising its product, maintaining distribution channels, and providing technical support. Compl. ¶¶ 100, 112, 124.

**D. PulseLink's Venue Allegations**

Zoom has no offices in this District and does not own or lease any property here. Elmore Decl. ¶¶ 20–21. Accordingly, PulseLink's venue allegations rely on several other categories of "places" with a purported connection to Zoom, discussed below.

**1. Remote employees**

PulseLink alleges that Zoom, through "a comprehensive work-from-home policy," has "adopted or ratified one or more additional places of business in this District, including but not limited to the homes of employees," and that Zoom has "over 180 remote employees in Texas," listing various job titles purportedly collected from LinkedIn. Compl. ¶¶ 18–20. PulseLink further alleges that Zoom "mak[es] use of offices in this District in at least Plano, Texas," and "operates out of or makes use of leased, work-share, co-op or other arrangements for space, offices or facilities in this District, including through its partners and/or agents." Compl. ¶ 18.

Of the employees living in Texas, 46 Zoom employees live and work remotely in this District. Elmore Decl. ¶ 12. No employee is required to work or live here. *Id.* ¶¶ 13, 16. Zoom offers its remote employees access to a third-party workplace platform and on-demand network called Upflex, through which an employee may elect to reserve a short-term workspace in various third-party co-working locations, including in this District. *Id.* ¶ 18. Zoom does not own or lease any Upflex-affiliated workspace, store inventory at any such location, or require any employee to use a specific Upflex location, in this District or elsewhere. *Id.*

**2. Zoom Node software**

PulseLink alleges that "Zoom Node" software installed on customers' servers—which PulseLink calls "Zoom Node appliances"—constitute regular and established places of business of Zoom. Compl. ¶ 30. PulseLink alleges that these nodes are "deployed at enterprise campuses and facilities throughout the District" and that Zoom "exercises exclusive and continuous 24/7 operational control over these proprietary nodes, managing all software deployments, security protocols, and performance parameters." *Id.*

Not true. Zoom Node is an enterprise-level software product, designed for customers to virtually connect the Zoom cloud to their own data centers. Robins Decl. ¶ 3. Zoom provides the software only; customers must install Zoom Node software on their own hardware in their own "customer data center." *Id.*; Ex. 1 (Zoom Node Data Sheet) ("[Zoom] customers will need to handle the hardware deployment." "At launch, customers will supply their own server[,] . . . and then install the Zoom Node . . . module on it."); Ex. 2 (Introduction to Zoom Node); Ex. 3 (Deploying a Zoom Node). Zoom Node software is configured by "installing the Zoom Node OS (a Linux-based operating system) onto enterprise data center servers, transforming them into Nodes," which then allows for the installation of "Service Modules" enabling additional services. Ex. 2 (Introduction to Zoom Node); Robins Decl. ¶ 3.

Zoom Node is installed and managed at the customer's premises by the customer's administrator, not by Zoom personnel. *See* Robins Decl. ¶ 3; Ex. 2 (Introduction to Zoom Node). Once a customer's server has Zoom Node software installed on it, the customer's administrator can assign services to it through Zoom's web portal and have configuration information pushed to the device automatically. Robins Decl. ¶ 3; Ex. 2 (Introduction to Zoom Node). The customer thereafter manages, upgrades, and troubleshoots the Node through that same web-based portal. Robins Decl. ¶ 3; Ex. 2 (Introduction to Zoom Node). No Zoom employee installs, services, or operates a Zoom Node at any customer's premises. Robins Decl. ¶ 4.

### 3. Data centers and cloud providers

Zoom uses data centers to support its video conferencing service. [redacted] *Id.* ¶ 10; Elmore Decl. ¶ 20.

[redacted] PulseLink alleges that Zoom works with third-party data centers and cloud providers to host its business in this District. Compl. ¶ 21. Specifically, PulseLink alleges that Zoom uses Oracle to host its "core video processing" capabilities via Oracle Cloud Infrastructure, which "utilizes and is co-located at Oracle data center in C1 Dallas-Allen (LOT 1) in Allen, Texas." *Id.* ¶ 22. PulseLink further alleges that Zoom "utilizes and is co-located at Microsoft's Point of Presence ('PoP') facility in Plano, Texas," in order to route traffic through this District to Zoom's API, "hosted in Zoom's Dallas data center or via AWS." *Id.* ¶ 23. According to PulseLink, the traffic is also "processed" through regional co-location facilities including CyrusOne and Digital Realty. *Id.* On these bases, PulseLink contends that "Zoom's core service functionality is regularly and systematically facilitated through physical hardware located in the Eastern District of Texas." *Id.* ¶¶ 23–24.

PulseLink's allegations are unsupported and incorrect. [redacted] Robins Decl. ¶ 6. [redacted]

*Id.* ¶ 7. [redacted]. *Id.* ¶ 8. [redacted] *Id.* ¶ 5; Exs. 22–23. [redacted]

[redacted] Compl. ¶ 22. [redacted]. Robins Decl. ¶ 10. [redacted] [redacted] [redacted] Robins Decl. ¶ 9. [redacted] Exs. 26–27. [redacted]. Robins Decl. ¶¶ 11–12.

**4. Reseller (Black Box)**

PulseLink alleges that Plano-based Black Box Limited is a "Zoom Platinum Partner and Certified Integrator" and "Reseller Partner" which "performs essential, certified technical installations and managed services for the Accused Product at Zoom's direction and control within this District." Compl. ¶¶ 26–29. PulseLink alleges that Black Box provides Zoom "certified design, deployment and lifecycle management" and "sales competencies, deployment service, and

support service." Compl. ¶¶ 26–29. On that basis, PulseLink alleges that Black Box "acts as Zoom's certified representative for the deployment and maintenance of Zoom Meetings throughout the Eastern District of Texas." Compl. ¶¶ 28–29.

Zoom has a [redacted] Ex. 4 ([redacted]); Robins Decl. ¶¶ 13–14. [redacted] Ex. 4 ([redacted]) at 10 ("[redacted]). [redacted] *Id.* at 3.

**5. Certification vendor (TekVizion)**

PulseLink also alleges that Plano-based TekVizion PVS, Inc. "manages the Zoom Hardware Partner Certification Program" and "validates the interoperability of Zoom rooms, and other Zoom partner ecosystem products," thereby acting as an agent. Compl. ¶ 25. But there is no agency relationship—[redacted] Robins Decl. ¶¶ 15–16. [redacted] *Id.* ¶ 17; *see also* Ex. 28 ([redacted]) [redacted]

[redacted] Robins Decl. ¶ 18.

#### 6. TX-RAMP certification

Zoom maintains a certification with the Texas Risk and Authorization Management Program ("TX-RAMP"), which is part of the Texas Department of Information Resources ("DIR") Cooperative Contracts program. Robins Decl. ¶ 19; Ex. 5 (TX-RAMP Manual) at 5. "TX-RAMP provides a standardized approach to the security assessment of cloud computing services." Ex. 5 at 6. With the certification, Zoom can conduct business with Texas state entities, such as universities and healthcare systems. *Id.* at 5; *see* Robins Decl. ¶ 19.

PulseLink alleges that Zoom's TX-RAMP certification and its participation in the DIR Cooperative Contracts program is evidence of a regular and established place of business because it allegedly reflects "a regulated, long-term operational presence within the State and this District." Compl. ¶¶ 31–32. To the contrary, maintaining the TX-RAMP certification requires only that Zoom's service is regularly available and operationally secure; it does not require Zoom's physical presence in this District. Robins Decl. ¶ 19; *see* Ex. 5 (TX-RAMP Manual) at 5.

### E. Relevant Prior Art Witnesses

Zoom has identified at least the below-listed prior art references as highly relevant to Zoom's invalidity case.[1] *See* Exs. 13–16 (Prior Art References). The references are patents and patent publications originally assigned to Cisco, Sony, Openwave Systems, and HP, all of which are based in either the Northern District of California or other locations outside of this District. The listed inventors of the prior art references, and their employers at the time, are likely to possess

[1] The claim chart attached hereto as Exhibit 12 summarizes the invalidating disclosures, which is based on Zoom's understanding of PulseLink's infringement allegations and is not intended to suggest that Zoom agrees with PulseLink's apparent interpretation or application of any claim term.

information and documents concerning the prior art, the state of the art, and the public use of any relevant prior art systems. Based on Zoom's investigation, 19 out of the 22 named prior artists reside in the Northern District of California or within 100 miles of its courts.

***'553 patent prior art.*** Relevant to the '553 patent, U.S. Patent No. 8,659,636, assigned to Cisco Technology Inc. in San Jose, California ("Cisco '636 patent"), discloses a method for executing a video conferencing system with switched video streams and a multipoint control unit ("MCU") network architecture. Ex. 13 (Cisco '636 Patent); Ex. 12 (Prior Art Claim Chart) at 1–2. This reference lists the following named inventors:

| Inventor | Listed Location | Current Location |
|---|---|---|
| Scott S. Firestone | Mountain View, CA | Mountain View, CA |
| Walter R. Friedrich | Pleasanton, CA | Lakewood Ranch, FL |
| Nermin M. Ismail | Mountain View, CA | Fremont, CA |
| Keith A. Lantz | Los Altos, CA | San Francisco, CA |
| Shantanu Sarkar | San Jose, CA | San Jose, CA |
| Luke K. Surazski | Santa Clara, CA | San Jose, CA |
| Duanpei Wu | San Jose, CA | San Jose, CA |

***'717 patent prior art.*** Relevant to the '717 patent, U.S. Patent No. 6,473,609, originally assigned to Openwave Systems Inc. in Redwood City, CA (the "Openwave '609 patent"), discloses a method for generating display screens with address identifiers (as opposed to full URLs) for user input. Ex. 14 (Openwave '609 patent); Ex. 12 (Prior Art Claim Chart) at 6–8. The reference lists the following named inventors:

| Inventor | Listed Location | Current Location |
|---|---|---|
| Bruce V. Schwartz | San Mateo, CA | Hillsborough, CA |
| Russell S. Greer | Los Gatos, CA | Los Gatos, CA |
| Stephen S. Boyle | Fremont, CA | San Francisco, CA |
| Mark A. Fox | San Mateo, CA | San Francisco, CA |
| Alain S. Rossmann | Palo Alto, CA | Palo Alto, CA |
| Mark G. Lentczner | Mountain View, CA | Mountain View, CA |
| Andrew L. Laursen | San Mateo, CA | Bend, OR |
| Brad E. Sandman | Sunnyvale, CA | Sunnyvale, CA |

***'231 patent prior art.*** Relevant to the '231 patent, U.S. Patent No. 7,908,393, assigned to

Sony Interactive Entertainment, Inc. headquartered in San Mateo, California[2] ("Sony '393 patent"), discloses a method for probing bandwidth while increasing the data transfer rate for packets. Ex. 15 (Sony '393 patent); Ex. 12 (Prior Art Claim Chart) at 3–5. This reference lists the following named inventors:

| Inventor | Listed Location | Current Location |
|---|---|---|
| James E. Marr | Burlingame, CA | San Francisco, CA |
| Yutaka Takeda | San Mateo, CA | Vacaville, CA |
| Attila Vass | Foster City, CA | Edinburgh, Scotland |
| Payton R. White | Foster City, CA | Foster City, CA |
| Stephen C. Detwiler | Oakland, CA | Oakland, CA |

Also relevant to the '231 patent, U.S. Patent Pub. No. 2006/0031564 assigned to Hewlett-Packard Development Company, L.P. (the "HP '564 application") discloses a method for determining whether there is sufficient network bandwidth for a second transmission rate. Ex. 16 (HP '564 application); Ex. 12 (Prior Art Claim Chart) at 3–5. This reference lists the following named inventors:

| Inventor | Listed Location | Current Location |
|---|---|---|
| John T. Brassil | Los Gatos, CA | Los Gatos, CA |
| Puneet Sharma | Palo Alto, CA | Palo Alto, CA |

Zoom is unaware of any relevant prior artist located in this District, or within 100 miles of its courts.

## III. VENUE IS NOT PROPER IN THIS DISTRICT

This case should be dismissed under Rule 12(b)(3) because venue is improper under 28 U.S.C. § 1400(b). In the alternative, the case should be transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a) because it is clearly more convenient.

[2] The Sony '393 patent was originally assigned to Tokyo-based Sony Computer Entertainment Inc., which has since merged into the entity now operating as Sony Interactive Entertainment, Inc. Exs. 17–18. The Sony '393 patent is now assigned to Sony Interactive Entertainment.

**A. This Case Should Be Dismissed for Improper Venue**

Venue is proper in a patent case where the defendant resides, or where it has committed acts of infringement and has a regular and established place of business. This requirement "is specific and unambiguous" and is not a "vague principle which . . . is to be given a liberal construction." *In re Cray Inc.*, 871 F.3d 1355, 1361 (Fed. Cir. 2017); 28 U.S.C. § 1400(b). PulseLink bears the burden of proving venue. *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018). Because Zoom does not reside in this District,[3] PulseLink must prove that Zoom has a regular and established place of business here. PulseLink cannot do so.

To show a regular and established place of business in this District, "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Cray*, 871 F.3d at 1360. The "physical place" element requires "a physical, geographical location in the district from which the business of the defendant is carried out." *Id.* at 1362. The "regular and established place of business" element "requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google LLC*, 949 F.3d 1338, 1345 (Fed. Cir. 2020) ("*Google I*"). That is, "the defendant *must actually engage in business* from that location." *Andra Grp., LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021) (quoting *Cray*, 871 F.3d at 1364) (emphasis in *Andra*). And to be a "place of the defendant," "it must be a place *of the defendant,* not solely a place of the defendant's employee." *Cray*, 871 F.3d at 1363 (emphasis in original).

Zoom does not have any "place" in this District that meets any, much less all, of these

[3] A domestic corporation "resides" only in its state of incorporation. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 270 (2017). It is uncontested that Zoom is incorporated in Delaware and thus does not reside in this District. Compl. ¶ 3.

requirements. Zoom has no offices in this District and does not own or lease any property here. Elmore Decl. ¶¶ 20–21. Because Zoom has no actual "place" in this District, PulseLink instead points to: (1) the homes of Zoom's remote employees; (2) Zoom Node software installed by Zoom's customers onto their own servers; (3) third-party resellers and certification labs such as Black Box and TekVizion; (4) third-party data centers and cloud providers; and (5) Zoom's registration and certifications with the State of Texas. *See* Section II.D *supra*. None of these allegations provide a sufficient basis for venue, alone or in combination.

**1. Remote employees do not establish venue**

PulseLink contends that Zoom's remote employees in Texas "constitute[] an aggregate network of regular and established places in this District, in and from which business is operated." Compl. ¶¶ 19–20. Without any supporting record, PulseLink lists several job listings that it contends are "in Texas and this District." *Id.* ¶ 20. These allegations are inadequate for establishing venue.

Merely pointing to a remote employee's home does not establish a defendant's place of business. *Cray*, 871 F.3d at 1365 (quoting *Am. Cyanamid Co. v. Nopco Chem. Co.*, 388 F.2d 818, 820 (4th Cir. 1968)) ("The statute clearly requires that venue be laid where 'the defendant has a regular and established place of business,' not where the defendant's employee owns a home in which he carries on some of the work that he does for the defendant"). Instead, relevant considerations include (1) "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place;" (2) "whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place;" and (3) "the nature and activity of the alleged place of business of the defendant in the district *in comparison with* that of other places of business of the defendant in other venues." *Cray*, 871 F.3d at 1363–64 (emphasis

in original). These factors all reinforce that venue is improper here: Zoom does not control employees' homes or condition their employment on their presence in this District, and Zoom's actual places of business, home to the core of its operations, are all outside this District.

**a. Zoom does not own, lease, or control employees' homes**

Although Zoom has 46 remote employees in this District, "[t]he fact that [a defendant] may allow its employees to work from the Eastern District of Texas does not establish proper venue in this district." *Pers. Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922, 936 (E.D. Tex. 2017); Elmore Decl. ¶ 12. What is required for venue is that the defendant owns or leases the employees' homes, or that it otherwise possesses or controls them. *Cray*, 871 F.3d at 1363. None of that is true here—Zoom neither owns nor leases any of its employees' homes in the District, nor has any control over them. Elmore Decl. ¶ 14.

PulseLink alleges Zoom has "over 180 remote employees" working in Texas, listing several job titles apparently obtained from a LinkedIn search. Compl. ¶ 19. But a defendant's control over a physical location cannot be shown merely by cataloging numbers of employees and job titles. Indeed, in *Celgene Corp. v. Mylan Pharms. Inc.*, the Federal Circuit refused to find venue based on the alleged "roster of employees who live in the state, a handful of business cards with employee names and New Jersey home addresses, and two LinkedIn profiles mentioning New Jersey," finding those allegations "too speculative to show [defendant's] ratification of those addresses as [their] places of business." 17 F.4th 1111, 1123 (Fed. Cir. 2021).

**b. Zoom does not condition employment on residing in this district or require storing materials here**

Zoom does not condition employment on an employee's continued residence in this District; in fact, Zoom has no policy regarding whether remote employees live in this District at all. Elmore Decl. ¶¶ 13–16; *Cray*, 871 F.3d at 1363. If Zoom's remote employees choose to work

in the District, it is not at Zoom's request. Elmore Decl. ¶¶ 13–16.

Contrary to PulseLink's conclusory allegations, Zoom does not "specifically advertise[] for and solicit[] sales and service employees to reside and work remotely in this District." Compl. ¶ 20; Elmore Decl. ¶ 15. At times, Zoom may require certain employees to reside within a broader territory or region. Elmore Decl. ¶ 16. For example, a sales manager responsible for maintaining partnerships in the central region of the United States may be required to live within a territory broadly comprising several states. *Id.* But Zoom does not require any employee to live in this District, let alone condition employment on their continued residence here. *Id.* ¶¶ 13, 16.

Zoom's remote employees in this District also do not store inventory or product here for distribution or sale. *Id.* ¶ 17; *Cray*, 871 F.3d at 1363. Zoom provides only standard IT equipment—a laptop, docking station, monitor, mouse, keyboard, and headset. Elmore Decl. ¶ 17. This type of generic office equipment given by Zoom to its employees does not transform the employees' homes into Zoom's place of business. *Netlist, Inc. v. Micron Tech., Inc.*, No. 2:25-cv-00558-JRG, Dkt. No. 26 at 5–6 (E.D. Tex. Mar. 6, 2026) ("company-paid laptops, office equipment (keyboard, mouse, headset, and monitor), phones with data plans, and internet reimbursement" in their homes are "insufficient for establishing venue").

**c. Zoom's business is concentrated outside of this District**

Zoom's business is concentrated outside of this District; of Zoom's more than 7,000 employees, fewer than 50 are located here. *See Cray*, 871 F.3d at 1364 (considering "the nature and activity of the alleged place of business of the defendant in the district *in comparison with* that of other places of business of the defendant in other venues"). Elmore Decl. ¶¶ 6, 12. In comparison, more than 800 employees work at Zoom's headquarters in San Jose, California, and approximately 600 are assigned to its Seattle or Denver offices. *Id.* ¶¶ 7–9. The 16 executives on Zoom's management team are predominantly located in or near San Jose or Seattle, and the only

one located in Texas is in Austin (outside of this District). *Id.* ¶ 11. As for the 46 employees in this District, the majority are sales staff, service technicians, or other non-technical employees; none have worked on the development or operation of the accused features. *Id.* ¶ 12; Hu Decl. ¶¶ 5–10; *see Rosco, Inc. v. Safety Vision LLC*, 2020 WL 5603794, at *3 (S.D.N.Y. Sept. 18, 2020) (finding no venue when the only employees in the district were "remote sales associates or installation technicians").

Thus, Zoom's remote employee locations do not support venue in this District.

**d. Coworking spaces in this District do not create venue**

PulseLink alleges that Zoom's use of third-party office space supports venue, but that is incorrect. Compl. ¶ 18. Zoom employees have the option to book a short-term workspace through accessing a third-party network called Upflex, which offers access to third-party locations across the country, including in this District. Elmore Decl. ¶ 18. Zoom does not own or lease space at any of these locations, nor does it require any employee to sign up for coworking space. Elmore Decl. ¶ 18. These transient workspaces that an employee might book one day and never use again are not "settle[d] certainly, or fix[ed] permanently" as required to show a regular and established place of business. *Cray*, 871 F.3d at 1363. Instead, they are definitionally the "sporadic activity" that the Federal Circuit held "cannot create venue." *Id.* at 1362.

**2. Zoom Node software does not establish venue**

PulseLink alleges that "Zoom also maintains a fixed and physical presence within this District through its proprietary Zoom Node appliances," which allegedly are "deployed at enterprise campuses and facilities across the District." Compl. ¶ 30. PulseLink further alleges that Zoom exercises "operational control over these proprietary nodes," and thus "physically occup[ies] space within this District with its proprietary infrastructure" in conducting its business. *Id.* These allegations are incorrect.

Contrary to PulseLink's assertion, the "Zoom Node" product is *software*—specifically, Linux-based OS software that Zoom's customers install onto their own servers in their own customer data centers. Robins Decl. ¶ 3; Ex. 2 (Introduction to Zoom Node). Thus, any physical hardware component associated with a Zoom Node is the customer's, not Zoom's. Robins Decl. ¶ 3; Ex. 1 (Zoom Node Data Sheet) ("[Zoom] customers will need to handle the hardware deployment."); Ex. 3 (Deploying a Zoom Node Management Server); *see* Section II.D.2 *supra*. What Zoom provides is at most a "virtual space" that cannot serve as a "place of business." *Cray*, 871 F.3d at 1362; *see Google I*, 949 F.3d at 1340, 1343 (deeming Google's server locations as a "place of business" where the physical servers were "owned by Google," "physically located in the district in a fixed, geographic location," and Google's contracts "tightly restrict[ed] the ISPs' ability to relocate the servers without Google's permission" and "strictly limit[ed] any unauthorized access to the space used by Google's servers").

A regular and established place of business also "requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place[.]" *Google I*, 949 F.3d at 1345 (internal quotations omitted). That is missing here, as no Zoom employees or agents have physically worked on any Zoom Node in the District. Robins Decl. ¶ 4. Any installation, management, upgrading, or troubleshooting of a Zoom Node occurs remotely through a web-based dashboard, not through Zoom personnel on site. Robins Decl. ¶¶ 3–4. Thus, Zoom Nodes do not constitute a regular and established place of business.

### 3. Alleged business partners do not establish venue

PulseLink alleges that Zoom's "systematic use of authorized agents . . . constitutes a regular and established place of business." Compl. ¶ 29. In particular, PulseLink points to Zoom's alleged relationships with (1) data centers and cloud providers that either have locations in or route data through this District; (2) a reseller of the Accused Product called Black Box; and (3) a certification

vendor named TekVizion. Compl. ¶¶ 21–29; *see* Section II.D.1–6 *supra*. None of these theories establish venue because Zoom has neither a physical presence at the vendors' premises nor any employee or agent conducting Zoom's business from the vendor locations.

Based on Zoom's investigation, [redacted] Section II.D.3 *supra*; *see* Robins Decl. ¶¶ 5–12. But rather than [redacted] Robins Decl. ¶ 10. To the extent PulseLink argues [redacted], that is still insufficient for venue, which requires the "regular, physical presence of an employee or other agent" conducting "the ***defendant's business***"[4] at that location. *Google I*, 949 F.3d at 1345 (servers owned by Google at third-party facility did not create venue because no Google employee or agent conducted Google's business there). Zoom is not aware of [redacted] Robins Decl. ¶¶ 11–12. Indeed, [redacted]." Ex. 26 ([redacted]) at 3. Thus, [redacted] does not constitute a regular and established place of business in this District.[5]

---

[4] All emphases added unless otherwise noted.

[5] Courts have specifically rejected the conflation of the work of third parties, like data centers, with companies who are customers and recipients of the third parties' services. *Audiopod IP, LLC v. Amazon.com, Inc.*, No. 3:24-cv-406-RCY, Dkt. No. 73 at 28–29 (E.D. Va. Mar. 3, 2025) (AWS personnel who "install, host, operate, and maintain" the defendant's servers did not create venue because the defendant was "not in the business of server installation, operation or maintenance")

As for the rest of the third parties identified by PulseLink, Zoom simply does not use them in this District. Section II.D.3 *supra*. [redacted] Robins Decl. ¶ 6. [redacted] *Id.* ¶ 8. [redacted] *Id.* ¶ 7. [redacted]. *Id.* ¶ 5. [redacted] *Id.* ¶¶ 13–18. [redacted]. *Id.* ¶ 14; *see Pers. Audio*, 280 F. Supp. 3d at 931 (venue is assessed as of the filing of the complaint). [redacted]. *Id.* ¶¶ 17–18 ([redacted]).

Even if Zoom did use any of these vendors, [redacted], Zoom is not aware of any Zoom employee present at any alleged third-party location in this District in the course of Zoom's business. Robins Decl. ¶ 11. And no agents conduct Zoom's business there, either. These vendors conduct *their own* business (operating data centers, providing cloud services, reselling, or certification testing), separate from Zoom's business as a video communication platform provider. [redacted] Ex. 4 ([redacted]) at 10 [redacted]); Ex. 24 ([redacted]) at 4 [redacted],

---

(cleaned up); *Audiopod IP, LLC v. Amazon.com, Inc.*, No. 2:24-cv-185-AWA, Dkt. No. 65 at 3 (E.D. Va. Mar. 31, 2025) (same).

[redacted] Ex. 28 ([redacted]) at 7 ("[redacted]").

Thus, PulseLink cannot show Zoom's "interim control" over any of the alleged agents' conduct necessary to demonstrate agency for venue. *In re Volkswagen Grp. of Am., Inc.*, 28 F.4th 1203, 1209 (Fed. Cir. 2022) ("*Volkswagen I*") (requiring "interim control" to demonstrate agency for venue); *Google I*, 949 F.3d at 1346–47 (ISP personnel performing installation and maintenance were not "conducting Google's business"). Because none of these third parties' locations qualifies as Zoom's place of business and no Zoom employee or agent conducts Zoom's business there, there is no basis for venue in this District.

**4. Zoom's certifications and registrations with the state of Texas do not establish venue**

PulseLink alleges that Zoom's registration to do business in Texas and its certification with TX-RAMP support venue in this District. Compl. ¶¶ 31–32. But the threshold requirement for venue is a physical place in the District. *Cray*, 871 F.3d at 1360. Nothing about TX-RAMP certification, which merely enables Zoom to provide cloud services to Texas state entities, pertains to whether Zoom has a physical presence in the District in any way. Robins Decl. ¶ 19; Ex. 5 (TX-RAMP Manual) at 44; Section II.D.6 *supra*. Rather, TX-RAMP requires only that Zoom's infrastructure is regularly available and operationally secure, without regard to where it may be located. Ex. 5 (TX-RAMP Manual) at 44; *see* Robins Decl. ¶ 19.

**B. In the alternative, this case should be transferred to the Northern District of California**

In the alternative, this case should be transferred to the Northern District of California because it is clearly more convenient. Neither party has any material ties to this District. In contrast, the relevant witnesses and documents are overwhelmingly concentrated in the Northern

District of California, where Zoom has its headquarters, where the accused features were designed and developed, and where significant sources of prior art reside.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. . . ." 28 U.S.C. § 1404(a). In this Circuit, the transfer analysis under Section 1404(a) requires a two-step inquiry. First, the court resolves the "preliminary question" of whether the case could have been brought in the proposed transferee forum. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*"). Second, the court balances the private and public interest factors to determine whether the transferee forum is "clearly more convenient." *Id.* at 315. Here, those factors leave no doubt that the Northern District of California is clearly more convenient.

**1. This case could have been filed in the Northern District of California**

PulseLink could have brought this suit in the Northern District of California. That is where Zoom is headquartered, and it is where many of the engineers who developed the accused features—and work on their operation and implementation—are located. Elmore Decl. ¶¶ 3–4; Hu Decl. ¶¶ 5–10. Thus, venue would have been proper in the Northern District of California, and the court there would have personal jurisdiction and subject matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1338(a), 1400(b).

**2. The private and public factors favor transfer**

The private and public interest factors also demonstrate that the Northern District of California is clearly more convenient, and the case should be transferred.

**a. The private interest factors favor transfer**

The private interest factors are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make a trial easy, expeditious, and

inexpensive." *Volkswagen II*, 545 F.3d at 315. Although no single factor is dispositive, the third of these factors, the "convenience for and cost of attendance of witnesses," has been described as "'the single most important factor in transfer analysis.'" *In re Juniper Networks, Inc.*, 14 F.4th 1313, 1318 (Fed. Cir. 2021). Together, these factors overwhelmingly favor transfer.

***The cost of attendance of willing witnesses.*** The most important factor in a venue transfer analysis—convenience for and cost of attendance of willing witnesses—strongly favors transfer. *In re Genentech, Inc.*, 566 F.3d 1338, 1343 (Fed. Cir. 2009). This factor is assessed as a function of the distance to be traveled, because greater distance means more time away from work and home and greater expense. *Volkswagen II*, 545 F.3d at 317; *see In re Volkswagen AG*, 371 F.3d 201, 204–205 (5th Cir. 2004) ("*Volkswagen III*"); *In re Acer Am. Corp.*, 626 F.3d 1252, 1255 (Fed. Cir. 2010). The court additionally considers "travel time," "meal and lodging expenses," "time witnesses must be away from their regular employment," and "personal costs associated with being away from work, family, and community when they testify far from home." *Volkswagen II*, 545 F.3d at 315; *see In re Nintendo Co.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009) (additional miles and time traveled are relevant).

The Zoom witnesses most knowledgeable about the development and functionality of the features accused in this case are located in the Northern District of California or China. Hu Decl. ¶¶ 5–10. At least the following technical witnesses are knowledgeable about one or more aspects of the accused features; each is based in San Jose or China. *See* Hu Decl. ¶¶ 5–10.

| Name | Title | Location |
|---|---|---|
| Hubert Hu | Head of Realtime Backend Engineering | [redacted] |
| Sam Sheng | Head of Meeting Engineering | [redacted] |
| Adam Wang | Software Development Engineer | [redacted] |
| Julia Wu | Software Development Engineer | [redacted] |
| Aaron Zhou | Manager, QoS Team | [redacted] |

Hubert Hu and Adam Wang are members of the teams that work on the accused Zone

Controller, MMR, and Zoom Mesh features. Aaron Zhou and Julia Wu are members of the team responsible for the accused bandwidth optimization function. Sam Sheng manages the team responsible for the accused push notification and embedded URI functions. None of these witnesses or their team members are based in or anywhere near this District.

For the witnesses located in San Jose, "significant expenses for airfare, meals, and lodging, as well as losses in productivity from time spent away at work . . . would be significantly minimized or avoided by transferring the case [from the Eastern District of Texas] to Northern California." *Acer*, 626 F.3d at 1255 (finding this factor "clearly" favors transfer). And for the China-based witnesses in Hangzhou (who would travel to the United States out of their nearest international airport in Shanghai), it would be significantly more burdensome to travel to Texas than to the Northern District of California.[6] For example, between Dallas/Fort Worth International Airport (DFW) and Shanghai Pudong International Airport (PVG), each leg takes approximately 15 hours, after which witnesses would need to travel more than two hours to reach this District. In contrast, for flights between San Francisco International Airport and PVG, each leg is about 12 hours long. Ex. 25 (Travel Time). This disparity is comparable to what the Fifth Circuit evaluated with respect to travel to the Western District of Texas, where it held that for witnesses based in China, "it is indisputable that the Northern District of California is clearly more convenient for these witnesses than the Western District of Texas." *See In re TikTok, Inc.*, 85 F.4th 352, 361–62 (5th Cir. 2023).

Moreover, no relevant Zoom or PulseLink witnesses live in this District. Elmore Decl. ¶¶ 11–12; Hu Decl. ¶¶ 5–10; Section II.A *supra*. Although 46 of Zoom's more than 7,000

---

[6] Zoom's standard work travel policy requires non-U.S. engineers who travel to the U.S. for work to work from Zoom's San Jose or Seattle offices. Elmore Decl. ¶ 19.

worldwide employees work remotely in this District, none has been involved in the design, development, or management of the accused features. *See* Elmore Decl. ¶¶ 6, 12; Hu Decl. ¶¶ 5–10. The Federal Circuit has directed the district court to transfer notwithstanding a defendant's in-district employees, because it was "far from clear that either of those employees ha[d] relevant or material information." *In re Apple Inc.*, 2022 WL 1196768, at *2 (Fed. Cir. Apr. 22, 2022) ("*Apple I*"). Where a plaintiff asserts an employee's relevance from an online profile, a defendant's sworn testimony that the employee does not work on the accused features controls. *See In re Google LLC*, 58 F.4th 1379, 1384 (Fed. Cir. 2023) ("*Google II*"). As for PulseLink, its complaint identifies no employees in this District, and its representatives appear to reside in Pennsylvania or Florida. Ex. 9 (D. Bitting LinkedIn Profile); Ex. 21 (PulseLink Texas Registration); Ex. 10 (S. Tanfield LinkedIn Profile).

This factor thus strongly favors transfer.

***Relative ease of access to sources of proof.*** The sources of proof factor strongly favors transfer. "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *Genentech*, 566 F.3d at 1345 (internal citation omitted). "[T]he location of document custodians and location where documents are created and maintained, which may bear on the ease of retrieval," must be considered. *In re Google LLC*, 2021 WL 5292267, at *2 (Fed. Cir. Nov. 15, 2021) ("*Google III*").

The bulk of the evidence relating to the accused features in this case is located at or near Zoom's San Jose headquarters in the Northern District of California. Hu Decl. ¶ 11; *Godo Kaisha IP Bridge 1 v. Xilinx, Inc.*, No. 2:17-CV-100-JRG-RSP, 2017 WL 4076052, at *3 (E.D. Tex. Sept. 14, 2017) (finding the bulk of discovery material is at a party's corporate headquarters). For

example, [redacted] Hu Decl. ¶ 12. Further, the accused features were developed primarily by members of the relevant engineering teams in Zoom's San Jose headquarters and China. Hu Decl. ¶¶ 5–10; Section II.B *supra*. Thus, the Zoom employees with access to the relevant technical documents are located primarily in those locations. Hu Decl. ¶¶ 5–11; *In re TikTok, Inc.*, 85 F.4th at 358–59 (key electronic evidence was not "equally accessible in either forum" because "only certain of petitioners' employees c[ould] access the source code").

In contrast, PulseLink's complaint does not indicate the existence of any relevant evidence located in this District. Where, like here, "the current district lacks any evidence relating to the case," "this factor weighs in favor of transfer." *Id.* at 358, 360; *In re Samsung Elecs. Co., Ltd.*, 2 F.4th 1371, 1379 (Fed. Cir. 2021) (district court assigned too little weight to the locus of the events giving rise to the claims). Thus, this factor strongly favors transfer.

***Availability of compulsory process to secure the attendance of witnesses.*** The availability of compulsory process factor strongly favors transfer. "Transfer is favored when a transferee district has absolute subpoena power over a greater number of non-party witnesses [than the transferor district]." *Adaptix, Inc. v. HTC Corp.*, 937 F. Supp. 2d 867, 874 (E.D. Tex. 2013). A district court's subpoena power extends: (1) "within 100 miles of where the person resides, is employed, or regularly transacts business in person," or (2) "within the state where the person resides, is employed, or regularly transacts business" if the person is "a party or a party's officer" or "would not incur substantial expense." Fed. R. Civ. P. 45(c)(1)(A)–(B).

Here, relevant non-party witnesses include at least relevant prior artists, the majority of whom reside in the Northern District of California. Zoom has identified at least four key prior art

references which will be highly relevant to Zoom's invalidity case. *See* Exs. 13–16 (Prior Art References). The references are patents and patent publications listing 22 inventors, ***19 of whom*** currently reside in the Northern District of California or within its subpoena power, and ***none*** of whom resides in this District or within 100 miles of its courts. Zoom is currently unaware of any relevant prior artist residing in or within the subpoena power of this District.

Courts have repeatedly recognized that the location of prior-art witnesses weighs in favor of transfer to the Northern District of California where, as here, the asserted prior art originates there. *See, e.g.*, *In re Juniper*, 14 F.4th at 1319 (Fed. Cir. 2021) ("We have [] rejected the district court's categorical assumption that defendants are likely to call few if any of the proposed [] prior-art witnesses that are identified for purposes of supporting transfer motions. . . . we also disapproved of the district court's discounting all of [defendant's] prior art witnesses; we stated that the categorical rejection of [defendant']s witnesses is . . . an abuse of discretion") (internal citations omitted). Moreover, Zoom has shown the relevance of the identified references by providing the Court with an exemplary claim chart. *See generally* Ex. 12.

In contrast to the identified prior artists, the other potential non-party witnesses Zoom is currently aware of—the named inventors of the Asserted Patents—are, with one exception, beyond the subpoena power of either district. Based on Zoom's investigation, two of the eight named inventors reside in New Jersey and four in Israel—beyond the compulsory process of either district. One named inventor (Xueshan Shan) resides in Los Altos, California, within the subpoena power of the Northern District of California. Only one named inventor (Stephen R. Whynot) resides in Allen, Texas, in this District.

| Patent | Inventor | Listed Location | Current Location |
|---|---|---|---|
| '717 | Wu Chou | Basking Ridge, NJ | Basking Ridge, NJ |
| '717 | Juan Jenny Li | South Orange, NJ | Matawan, NJ |
| '717 | Xueshan Shan | Orefield, PA | Los Altos, CA |

| Patent | Inventor | Listed Location | Current Location |
|---|---|---|---|
| ’553 | Stephen R. Whynot | Allen, TX | Allen, TX |
| ’231 | Oren Bakshe | Kyryat-Ono, Israel | Kyryat-Ono, Israel |
| ’231 | Eyal Sayar | Kyryat-Ono, Israel | Kyryat-Ono, Israel |
| ’231 | Gal Keren | Ramat-Gan, Israel | Ramat-Gan, Israel |
| ’231 | Ori Modai | Ramat Hasharon, Israel | Ramat Hasharon, Israel |

Thus, only one potential non-party witness identified to date resides within the subpoena power of this Court. In contrast, at least 20 relevant non-party witnesses (one of the named inventors and 19 prior art witnesses) are within the subpoena power of the Northern District of California. Because “there is a substantial number of witnesses within the subpoena power of the Northern District of California” and at most one witness who could be compelled to appear in this District, this factor supports transfer, “and not only slightly.” *In re Genentech*, 566 F.3d at 1345.

***Other practical problems.*** This factor considers “other practical problems that make a trial easy, expeditious, and inexpensive” that were not addressed by the preceding factors. *Nintendo*, 589 F.3d at 1198. Given that no answer has been filed and discovery has not begun, transfer would not hinder progress of the case or prejudice PulseLink. Thus, this factor is neutral. *See TikTok*, 85 F.4th at 362–63.

**b. The public factors favor transfer**

The public interest factors are “(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law.” *Volkswagen II*, 545 F.3d at 315. These factors likewise confirm that transfer is appropriate.

***The Northern District of California has a stronger local interest in adjudication.*** The local interest factor strongly supports transfer. “This factor most notably regards not merely the parties’ significant connections to each forum writ large, but rather the significant connections

between a particular venue and ***the events that gave rise to a suit***." *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020) ("*Apple II*") (emphasis in original) (internal quotations and citations omitted). Indeed, as the Fifth Circuit has recognized, "the place of the alleged wrong is one of the most important factors in venue determinations." *Def. Distributed v. Bruck*, 30 F.4th 414, 435 (5th Cir. 2022) (internal quotations and citations omitted).

Here, the Northern District of California is the U.S. epicenter of the events that gave rise to PulseLink's claims, including research, design, and development of the accused functionalities. *See, e.g.*, Hu Decl. ¶¶ 5–11; *In re HP Inc.*, 826 F. App'x 899, 901 (Fed. Cir. 2020) (recognizing this factor favored transfer when "more of the events giving rise to this suit appear to have occurred in the Northern District of California than in the Eastern District of Texas—specifically, the development of the accused products.").

This District has no similar interest in deciding this case. Zoom does not have an office in Texas, the accused features were developed elsewhere, and the majority of its remote employees in the District work in sales, service, or other non-technical roles. Elmore Decl. ¶¶ 12, 21; Hu Decl. ¶¶ 5–10. Although the Zoom platform is available nationwide, that fact is "disregarded in favor of particularized local interests." *Wireless Recognition Techs. LLC v. A9.com, Inc.*, No. 2:10-cv-364-JRG, 2012 WL 506669, at *6 (E.D. Tex. Feb. 15, 2012) (citing *Volkswagen II*, 545 F.3d at 318). And although PulseLink claims to conduct its patent monetization business in this District, the Federal Circuit has "repeatedly rejected that a party's general presence in a particular district can alone give that district a special interest in the case." *In re Apple Inc.*, 2021 WL 5291804, at *5 (Fed. Cir. Nov. 15, 2021) ("*Apple III*") (cleaned up).

Thus, based on Zoom's extensive ties to the Northern District of California and lack of relevant connections to this District, and because the accused products were designed, developed,

and tested in the Northern District of California, this factor strongly favors transfer. *See Apple II*, 979 F.3d at 1345.

***Other public interest factors.*** The remaining public interest factors are neutral. Both districts are similarly equipped to handle patent infringement cases, and there are no concerns about conflicts of law or application of foreign law. "[W]hen other relevant factors weigh in favor of transfer or are neutral, 'then the speed of the transferee district court [(first factor)] should not alone outweigh all of those other factors.'" *In re Google LLC*, 2021 WL 4427899, at *7 (Fed. Cir. Sept. 27, 2021) ("*Google IV*").

* * *

Application of the private and public interest factors confirms that the Northern District of California is clearly more convenient, as summarized below:

| Factor | Effect |
|---|---|
| Cost of attendance for willing witnesses | Strongly favors transfer |
| Relative ease of access to sources of proof | Strongly favors transfer |
| Availability of compulsory process | Strongly favors transfer |
| Other practical problems | Neutral |
| Administrative difficulties from court congestion | Neutral |
| Local interest in deciding local controversies | Strongly favors transfer |
| Familiarity of the forum with governing law | Neutral |
| Avoidance of conflict-of-laws problems | Neutral |

## IV. PULSELINK'S INDIRECT INFRINGEMENT CLAIMS SHOULD BE DISMISSED

PulseLink also fails to state a claim for indirect infringement; accordingly, those claims should be dismissed under Rule 12(b)(6). The pleading standard for induced infringement requires showing "active steps to encourage direct infringement," meaning "affirmative, as opposed to passive, steps to bring about the desired result." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,

146 S. Ct. 1391, 1399–1401 (2026) (cleaned up). Generic allegations identifying "ordinary acts incident to product distribution" that fail to "rule out obvious explanations for the defendant's conduct" are insufficient. *Id.*

PulseLink alleges that Zoom has induced infringement by "run[ning] advertisements that promote the infringing use[,]" "maintaining established distribution channels for the Accused Product[,]" "distributing . . . the Zoom Client and instructions or manuals," "testing the Accused Product," "and/or providing technical support or services for the Accused Product." Compl. ¶¶ 100, 112, 124. These alleged activities do not reflect any affirmative steps to encourage infringement of any asserted claim, let alone relate to any specific accused feature. Thus, they are nothing more than the kind of "ordinary acts incident to product distribution" that the Supreme Court held was insufficient under Rule 12(b)(6) in *Hikma*. Thus, PulseLink's indirect infringement claims should be dismissed.

## V. CONCLUSION

For the foregoing reasons, Zoom respectfully requests that the Court dismiss this case for improper venue, or in the alternative, transfer this case to the Northern District of California, and dismiss the indirect infringement claims.

Dated: July 21, 2026

Respectfully submitted,

*/s/ Benjamin Hershkowitz*
Benjamin Hershkowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave
New York, NY 10166
(212) 351-2410
bhershkowitz@gibsondunn.com

Melissa R. Smith
Texas State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Phone: (903) 934-8450
Fax: (903) 934-9257
Email: melissa@gillamsmithlaw.com

*Counsel for Defendant Zoom Communications, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2026, the foregoing was filed electronically in compliance with Local Rule CV-5(a) and served via the Court's CM/ECF on all counsel of record who have consented to electronic service.

*/s/ Melissa R. Smith*
Melissa R. Smith

**CERTIFICATE OF AUTHORIZATION TO SEAL**

I hereby certify that, prior to filing the foregoing document and its attachments under seal, a motion to seal such documents was filed with the Court.

*/s/ Benjamin Hershkowitz*
Benjamin Hershkowitz